# BERGER *v.* NEW YORK.

No. 615.   Argued April 13, 1967.—Decided June 12, 1967.

*Joseph E. Brill* argued the cause for petitioner. With him on the brief was *Abraham Glasser.*

*H. Richard Uviller* argued the cause for respondent. With him on the brief were *Frank S. Hogan* and *Alan F. Scribner.*

Briefs of *amici curiae,* urging reversal, were filed by *Jack Grant Day* and *Gerald Zuckerman* for the National Association of Defense Lawyers in Criminal Cases; by *John J. McAvoy* for the New York Civil Liberties Union, and by *Raymond W. Bergan* for the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Briefs of *amici curiae,* urging affirmance, were filed by *Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Amy Juviler,* Assistant Attorney General, for the Attorney General of the State of New York, and by *G. Robert Blakey* for Elliot L. Richardson, Attorney General of Massachusetts, *Robert Y. Thornton,* Attorney General of Oregon, and the National District Attorneys' Association.

MR. JUSTICE CLARK delivered the opinion of the Court.

This writ tests the validity of New York's permissive eavesdrop statute, N. Y. Code Crim. Proc. § 813–a,[1] under the Fourth, Fifth, Ninth, and Fourteenth Amendments. The claim is that the statute sets up a system of surveillance which involves trespassory intrusions into private, constitutionally protected premises, authorizes

---

[1] "§ 813–a. Ex parte order for eavesdropping

"An ex parte order for eavesdropping as defined in subdivisions one and two of section seven hundred thirty-eight of the penal law may be issued by any justice of the supreme court or judge of a county court or of the court of general sessions of the county of New York upon oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof, that there is reasonable ground to believe that evidence of crime may be thus obtained, and particularly describing the person or persons whose communications, conversations or discussions are to be overheard or recorded and the purpose thereof, and, in the case of a telegraphic or telephonic communication, identifying the particular telephone number or telegraph line involved. In connection with the issuance of such an order the justice or judge may examine on oath the applicant and any other witness he may produce and shall satisfy himself of the existence of reasonable grounds for the granting of such application. Any such order shall be effective for the time specified therein but not for a period of more than two months unless extended or renewed by the justice or judge who signed and issued the original order upon satisfying himself that such extension or renewal is in the public interest. Any such order together with the papers upon which the application was based, shall be delivered to and retained by the applicant as authority for the eavesdropping authorized therein. A true copy of such order shall at all times be retained in his possession by the judge or justice issuing the same, and, in the event of the denial of an application for such an order, a true copy of the papers upon which the application was based shall in like manner be retained by the judge or justice denying the same. As amended L. 1958, c. 676, eff. July 1, 1958."

44

"general searches" for "mere evidence," [2] and is an invasion of the privilege against self-incrimination. The trial court upheld the statute, the Appellate Division affirmed without opinion, 25 App. Div. 2d 718, 269 N. Y. S. 2d 368, and the Court of Appeals did likewise by a divided vote. 18 N. Y. 2d 638, 219 N. E. 2d 295. We granted certiorari, 385 U. S. 967 (1966). We have concluded that the language of New York's statute is too broad in its sweep resulting in a trespassory intrusion into a constitutionally protected area and is, therefore, violative of the Fourth and Fourteenth Amendments. This disposition obviates the necessity for any discussion of the other points raised.

I.

Berger, the petitioner, was convicted on two counts of conspiracy to bribe the Chairman of the New York State Liquor Authority. The case arose out of the complaint of one Ralph Pansini to the District Attorney's office that agents of the State Liquor Authority had entered his bar and grill and without cause seized his books and records. Pansini asserted that the raid was in reprisal for his failure to pay a bribe for a liquor license. Numerous complaints had been filed with the District Attorney's office charging the payment of bribes by applicants for liquor licenses. On the direction of that office, Pansini, while equipped with a "minifon" recording device, interviewed an employee of the Authority. The employee advised Pansini that the price for a license was $10,000 and suggested that he contact attorney Harry Neyer. Neyer subsequently told Pansini that he worked with the Authority employee before and that the latter was aware of the going rate on liquor licenses downtown.

---

[2] This contention is disposed of in *Warden, Maryland Penitentiary* v. *Hayden*, 387 U. S. 294, adversely to petitioner's assertion here.

On the basis of this evidence an eavesdrop order was obtained from a Justice of the State Supreme Court, as provided by § 813–a. The order permitted the installation, for a period of 60 days, of a recording device in Neyer's office. On the basis of leads obtained from this eavesdrop a second order permitting the installation, for a like period, of a recording device in the office of one Harry Steinman was obtained. After some two weeks of eavesdropping a conspiracy was uncovered involving the issuance of liquor licenses for the Playboy and Tenement Clubs, both of New York City. Petitioner was indicted as "a go-between" for the principal conspirators, who though not named in the indictment were disclosed in a bill of particulars. Relevant portions of the recordings were received in evidence at the trial and were played to the jury, all over the objection of the petitioner. The parties have stipulated that the District Attorney "had no information upon which to proceed to present a case to the Grand Jury, or on the basis of which to prosecute" the petitioner except by the use of the eavesdrop evidence.

## II.

Eavesdropping is an ancient practice which at common law was condemned as a nuisance. 4 Blackstone, Commentaries 168. At one time the eavesdropper listened by naked ear under the eaves of houses or their windows, or beyond their walls seeking out private discourse. The awkwardness and undignified manner of this method as well as its susceptibility to abuse was immediately recognized. Electricity, however, provided a better vehicle and with the advent of the telegraph surreptitious interception of messages began. As early as 1862 California found it necessary to prohibit the practice by statute. Statutes of California 1862, p. 288, CCLXII. During the Civil War General J. E. B. Stuart

46

is reputed to have had his own eavesdropper along with him in the field whose job it was to intercept military communications of the opposing forces. Subsequently newspapers reportedly raided one another's news gathering lines to save energy, time, and money. Racing news was likewise intercepted and flashed to bettors before the official result arrived.

The telephone brought on a new and more modern eavesdropper known as the "wiretapper." Interception was made by a connection with a telephone line. This activity has been with us for three-quarters of a century. Like its cousins, wiretapping proved to be a commercial as well as a police technique. Illinois outlawed it in 1895 and in 1905 California extended its telegraph interception prohibition to the telephone. Some 50 years ago a New York legislative committee found that police, in cooperation with the telephone company, had been tapping telephone lines in New York despite an Act passed in 1895 prohibiting it. During prohibition days wiretaps were the principal source of information relied upon by the police as the basis for prosecutions. In 1934 the Congress outlawed the interception without authorization, and the divulging or publishing of the contents of wiretaps by passing § 605 of the Communications Act of 1934.[3] New York, in 1938, declared by constitutional amendment that "[t]he right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated," but permitted by *ex parte* order of the Supreme Court of the State the interception of communications on a showing of "reasonable ground to believe that evidence of crime" might be obtained. N. Y. Const. Art. I, § 12.

Sophisticated electronic devices have now been developed (commonly known as "bugs") which are capable of

---

[3] 48 Stat. 1103, 47 U. S. C. § 605.

eavesdropping on anyone in almost any given situation. They are to be distinguished from "wiretaps" which are confined to the interception of telegraphic and telephonic communications. Miniature in size ($\frac{3}{8}''$ x $\frac{3}{8}''$ x $\frac{1}{8}''$)—no larger than a postage stamp—these gadgets pick up whispers within a room and broadcast them half a block away to a receiver. It is said that certain types of electronic rays beamed at walls or glass windows are capable of catching voice vibrations as they are bounced off the surfaces. Since 1940 eavesdropping has become a big business. Manufacturing concerns offer complete detection systems which automatically record voices under almost any conditions by remote control. A microphone concealed in a book, a lamp, or other unsuspected place in a room, or made into a fountain pen, tie clasp, lapel button, or cuff link increases the range of these powerful wireless transmitters to a half mile. Receivers pick up the transmission with interference-free reception on a special wave frequency. And, of late, a combination mirror transmitter has been developed which permits not only sight but voice transmission up to 300 feet. Likewise, parabolic microphones, which can overhear conversations without being placed within the premises monitored, have been developed. See Westin, Science, Privacy, and Freedom: Issues and Proposals for the 1970's, 66 Col. L. Rev. 1003, 1005–1010.

As science developed these detection techniques, lawmakers, sensing the resulting invasion of individual privacy, have provided some statutory protection for the public. Seven States, California, Illinois, Maryland, Massachusetts, Nevada, New York, and Oregon, prohibit surreptitious eavesdropping by mechanical or electronic device.[4] However, all save Illinois permit official court-

---

[4] Cal. Pen. Code §§ 653h–j; Ill. Rev. Stat., c. 38, §§ 14–1 to 14–7 (1965); Md. Ann. Code, Art. 27, § 125A (1957); Mass. Gen. Laws,

ordered eavesdropping. Some 36 States prohibit wiretapping.[5] But of these, 27 permit "authorized" interception of some type. Federal law, as we have seen, prohibits interception and divulging or publishing of the content of wiretaps without exception.[6] In sum, it is fair to say that wiretapping on the whole is outlawed, except for permissive use by law enforcement officials in

---

c. 272, § 99 (Supp. 1966); Nev. Rev. Stat. § 200.650 (1963); N. Y. Pen. Law § 738 (Supp. 1966); Ore. Rev. Stat. § 165.540 (1)(c) (Supp. 1965).

[5] Ala. Code, Tit. 48, § 414 (1958); Alaska Stat. § 42.20.100 (1962); Ark. Stat. Ann. § 73–1810 (1957); Cal. Pen. Code § 640; Colo. Rev. Stat. Ann. § 40–4–17 (1963); Conn. Gen. Stat. Rev. § 53–140 (1958); Del. Code Ann., Tit. 11, § 757 (Supp. 1966); Fla. Stat. § 822.10 (1965); Hawaii Rev. Laws § 309 A–1 (Supp. 1963); Idaho Code Ann. §§ 18–6704, 6705 (1947); Ill. Rev. Stat., c. 134, § 16 (1965); Iowa Code § 716.8 (1962); Ky. Rev. Stat. § 433.430 (1962); La. Rev. Stat. § 14:322 (1950); Md. Ann. Code, Art. 35, §§ 92, 93 (1957); Mass. Gen. Laws, c. 272, § 99 (Supp. 1966); Mich. Stat. Ann. § 28.808 (1954); Mont. Rev. Codes Ann. § 94–3203 (Supp. 1965); Neb. Rev. Stat. § 86–328 (1966); Nev. Rev. Stat. §§ 200.620, 200.630 (1963); N. J. Rev. Stat. § 2A:146–1 (1953); N. M. Stat. Ann. § 40A–12–1 (1964); N. Y. Pen. Law § 738 (Supp. 1966); N. C. Gen. Stat. § 14–155 (1953); N. D. Cent. Code § 8–10–07 (1959); Ohio Rev. Code Ann. § 4931.28 (1954); Okla. Stat., Tit. 21, § 1757 (1961); Ore. Rev. Stat. § 165.540 (1) (Supp. 1965); Pa. Stat. Ann., Tit. 15, § 2443 (1958); R. I. Gen. Laws Ann. § 11–35–12 (1956); S. D. Code § 13.4519 (1939); Tenn. Code Ann. § 65–2117 (1955); Utah Code Ann. § 76–48–11 (1953); Va. Code Ann. § 18.1–156 (1960 Repl. Vol.); Wis. Stat. § 134.39 (1963); Wyo. Stat. Ann. § 37–259 (1957).

[6] A recent Federal Communications Commission Regulation, 31 Fed. Reg. 3400, 47 CFR § 2.701, prohibits the use of "a device required to be licensed by section 301 of the Communications Act" for the purpose of eavesdropping. This regulation, however, exempts use under "lawful authority" by police officers and the sanctions are limited to loss of license and the imposition of a fine. The memorandum accompanying the regulation stated: "What constitutes a crime under State law reflecting State policy applicable to radio eavesdropping is, of course, unaffected by our rules." *Id.*, at 3399.

some States; while electronic eavesdropping is—save for seven States—permitted both officially and privately. And, in six of the seven States electronic eavesdropping ("bugging") is permissible on court order.

## III.

The law, though jealous of individual privacy, has not kept pace with these advances in scientific knowledge. This is not to say that individual privacy has been relegated to a second-class position for it has been held since Lord Camden's day that intrusions into it are "subversive of all the comforts of society." *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 1066 (1765). And the Founders so decided a quarter of a century later when they declared in the Fourth Amendment that the people had a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Indeed, that right, they wrote, "shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Almost a century thereafter this Court took specific and lengthy notice of *Entick* v. *Carrington, supra,* finding that its holding was undoubtedly familiar to and "in the minds of those who framed the Fourth Amendment . . . ." *Boyd* v. *United States,* 116 U. S. 616, 626–627 (1886). And after quoting from Lord Camden's opinion at some length, Mr. Justice Bradley characterized it thus:

> "The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case . . . they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life." At 630.

50

*Boyd* held unconstitutional an Act of the Congress authorizing a court of the United States to require a defendant in a revenue case to produce in court his private books, invoices, and papers or else the allegations of the Government were to be taken as confessed. The Court found that "the essence of the offense . . . [was] the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment." *Ibid.* The Act—the Court found—violated the Fourth Amendment in that it authorized a general search contrary to the Amendment's guarantee.

The Amendment, however, carried no criminal sanction, and the federal statutes not affording one, the Court in 1914 formulated and pronounced the federal exclusionary rule in *Weeks* v. *United States,* 232 U. S. 383. Prohibiting the use in federal courts of any evidence seized in violation of the Amendment, the Court held:

> "The effect of the Fourth Amendment is to put the courts of the United States . . . under limitations and restraints as to the exercise of such power . . . and to forever secure the people . . . against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all . . . . The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." At 391–392.

### IV.

The Court was faced with its first wiretap case in 1928, *Olmstead* v. *United States,* 277 U. S. 438. There

the interception of Olmstead's telephone line was accomplished without entry upon his premises and was, therefore, found not to be proscribed by the Fourth Amendment. The basis of the decision was that the Constitution did not forbid the obtaining of evidence by wiretapping unless it involved actual unlawful entry into the house. Statements in the opinion that a conversation passing over a telephone wire cannot be said to come within the Fourth Amendment's enumeration of "persons, houses, papers, and effects" have been negated by our subsequent cases as hereinafter noted. They found "conversation" was within the Fourth Amendment's protections, and that the use of electronic devices to capture it was a "search" within the meaning of the Amendment, and we so hold. In any event, Congress soon thereafter, and some say in answer to *Olmstead,* specifically prohibited the interception without authorization and the divulging or publishing of the contents of telephonic communications. And the *Nardone* cases, 302 U. S. 379 (1937) and 308 U. S. 338 (1939), extended the exclusionary rule to wiretap evidence offered in federal prosecutions.

The first "bugging" case reached the Court in 1942 in *Goldman* v. *United States,* 316 U. S. 129. There the Court found that the use of a detectaphone placed against an office wall in order to hear private conversations in the office next door did not violate the Fourth Amendment because there was no physical trespass in connection with the relevant interception. And in *On Lee* v. *United States,* 343 U. S. 747 (1952), we found that since "no trespass was committed" a conversation between Lee and a federal agent, occurring in the former's laundry and electronically recorded, was not condemned by the Fourth Amendment. Thereafter in *Silverman* v. *United States,* 365 U. S. 505 (1961), the Court found "that the eavesdropping was accomplished by means of

an unauthorized physical penetration into the premises occupied by the petitioners." At 509. A spike a foot long with a microphone attached to it was inserted under a baseboard into a party wall until it made contact with the heating duct that ran through the entire house occupied by Silverman, making a perfect sounding board through which the conversations in question were overheard. Significantly, the Court held that its decision did "not turn upon the technicality of a trespass upon a party wall as a matter of local law. It is based upon the reality of an actual intrusion into a constitutionally protected area." At 512.

In *Wong Sun* v. *United States,* 371 U. S. 471 (1963), the Court for the first time specifically held that verbal evidence may be the fruit of official illegality under the Fourth Amendment along with the more common tangible fruits of unwarranted intrusion. It used these words:

> "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States,* 365 U. S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' " At 485.

And in *Lopez* v. *United States,* 373 U. S. 427 (1963), the Court confirmed that it had "in the past sustained instances of 'electronic eavesdropping' against constitutional challenge, when devices have been used to enable government agents to overhear conversations which would have been beyond the reach of the human ear. . . . It has been insisted only that the electronic device not be planted by an unlawful physical invasion of a constitutionally protected area." At 438–439. In

this case a recording of a conversation between a federal agent and the petitioner in which the latter offered the agent a bribe was admitted in evidence. Rather than constituting "eavesdropping" the Court found that the recording "was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." At 439.

## V.

It is now well settled that "the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth" Amendment. *Mapp* v. *Ohio,* 367 U. S. 643, 655 (1961). "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Wolf* v. *Colorado,* 338 U. S. 25, 27 (1949). And its "fundamental protections . . . are guaranteed . . . against invasion by the States." *Stanford* v. *Texas,* 379 U. S. 476, 481 (1965). This right has most recently received enunciation in *Camara* v. *Municipal Court,* 387 U. S. 523. "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." At 528. Likewise the Court has decided that while the "standards of reasonableness" required under the Fourth Amendment are the same under the Fourteenth, they "are not susceptible of Procrustean application . . . ." *Ker* v. *California,* 374 U. S. 23, 33 (1963). We said there that "the reasonableness of a search is . . . [to be determined] by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment." *Ibid.*

We, therefore, turn to New York's statute to determine the basis of the search and seizure authorized by it upon the order of a state supreme court justice, a county judge or general sessions judge of New York County. Section 813-a authorizes the issuance of an "ex parte order for eavesdropping" upon "oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof . . . ." The oath must state "that there is reasonable ground to believe that evidence of crime may be thus obtained, and particularly describing the person or persons whose communications, conversations or discussions are to be overheard or recorded and the purpose thereof, and . . . identifying the particular telephone number or telegraph line involved." The judge "may examine on oath the applicant and any other witness he may produce and shall satisfy himself of the existence of reasonable grounds for the granting of such application." The order must specify the duration of the eavesdrop—not exceeding two months unless extended—and "[a]ny such order together with the papers upon which the application was based, shall be delivered to and retained by the applicant as authority for the eavesdropping authorized therein."

While New York's statute satisfies the Fourth Amendment's requirement that a neutral and detached authority be interposed between the police and the public, *Johnson* v. *United States,* 333 U. S. 10, 14 (1948), the broad sweep of the statute is immediately observable. It permits the issuance of the order, or warrant for eavesdropping, upon the oath of the attorney general, the district attorney or any police officer above the rank of sergeant stating that "there is reasonable ground to believe that evidence of crime may be thus obtained . . . ." Such a requirement raises a serious

probable-cause question under the Fourth Amendment. Under it warrants may only issue "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. *Carroll* v. *United States,* 267 U. S. 132, 162 (1925); *Husty* v. *United States,* 282 U. S. 694, 700–701 (1931); *Brinegar* v. *United States,* 338 U. S. 160, 175–176 (1949).

It is said, however, by the petitioner, and the State agrees, that the "reasonable ground" requirement of § 813–a "is undisputedly equivalent to the probable cause requirement of the Fourth Amendment." This is indicated by *People* v. *Grossman,* 45 Misc. 2d 557, 257 N. Y. S. 2d 266, reversed on other grounds, 27 App. Div. 2d 572, 276 N. Y. S. 2d 168. Also see *People* v. *Beshany,* 43 Misc. 2d 521, 252 N. Y. S. 2d 110. While we have found no case on the point by New York's highest court, we need not pursue the question further because we have concluded that the statute is deficient on its face in other respects. Since petitioner clearly has standing to challenge the statute, being indisputably affected by it, we need not consider either the sufficiency of the affidavits upon which the eavesdrop orders were based, or the standing of petitioner to attack the search and seizure made thereunder.

The Fourth Amendment commands that a warrant issue not only upon probable cause supported by oath or affirmation, but also "particularly describing the place to be searched, and the persons or things to be seized." New York's statute lacks this particularization. It merely says that a warrant may issue on reasonable

ground to believe that evidence of crime may be obtained by the eavesdrop. It lays down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor "the place to be searched," or "the persons or things to be seized" as specifically required by the Fourth Amendment. The need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad in scope. As was said in *Osborn* v. *United States*, 385 U. S. 323 (1966), the "indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments," and imposes "a heavier responsibility on this Court in its supervision of the fairness of procedures . . . ." At 329, n. 7. There, two judges acting jointly authorized the installation of a device on the person of a prospective witness to record conversations between him and an attorney for a defendant then on trial in the United States District Court. The judicial authorization was based on an affidavit of the witness setting out in detail previous conversations between the witness and the attorney concerning the bribery of jurors in the case. The recording device was, as the Court said, authorized "under the most precise and discriminate circumstances, circumstances which fully met the 'requirement of particularity'" of the Fourth Amendment. The Court was asked to exclude the evidence of the recording of the conversations seized pursuant to the order on constitutional grounds, *Weeks* v. *United States, supra,* or in the exercise of supervisory power, *McNabb* v. *United States*, 318 U. S. 332 (1943). The Court refused to do so finding that the recording, although an invasion of the privacy protected by the

Fourth Amendment, was admissible because of the authorization of the judges, based upon "a detailed factual affidavit alleging the commission of a specific criminal offense directly and immediately affecting the administration of justice . . . for the narrow and particularized purpose of ascertaining the truth of the affidavit's allegations." At 330. The invasion was lawful because there was sufficient proof to obtain a search warrant to make the search for the limited purpose outlined in the order of the judges. Through these "precise and discriminate" procedures the order authorizing the use of the electronic device afforded similar protections to those that are present in the use of conventional warrants authorizing the seizure of tangible evidence. Among other safeguards, the order described the type of conversation sought with particularity, thus indicating the specific objective of the Government in entering the constitutionally protected area and the limitations placed upon the officer executing the warrant. Under it the officer could not search unauthorized areas; likewise, once the property sought, and for which the order was issued, was found the officer could not use the order as a passkey to further search. In addition, the order authorized one limited intrusion rather than a series or a continuous surveillance. And, we note that a new order was issued when the officer sought to resume the search and probable cause was shown for the succeeding one. Moreover, the order was executed by the officer with dispatch, not over a prolonged and extended period. In this manner no greater invasion of privacy was permitted than was necessary under the circumstances. Finally the officer was required to and did make a return on the order showing how it was executed and what was seized. Through these strict precautions the danger of an unlawful search and seizure was minimized.

By contrast, New York's statute lays down no such "precise and discriminate" requirements. Indeed, it authorizes the "indiscriminate use" of electronic devices as specifically condemned in *Osborn*. "The proceeding by search warrant is a drastic one," *Sgro* v. *United States*, 287 U. S. 206, 210 (1932), and must be carefully circumscribed so as to prevent unauthorized invasions of "the sanctity of a man's home and the privacies of life." *Boyd* v. *United States*, 116 U. S. 616, 630. New York's broadside authorization rather than being "carefully circumscribed" so as to prevent unauthorized invasions of privacy actually permits general searches by electronic devices, the truly offensive character of which was first condemned in *Entick* v. *Carrington*, 19 How. St. Tr. 1029, and which were then known as "general warrants." The use of the latter was a motivating factor behind the Declaration of Independence. In view of the many cases commenting on the practice it is sufficient here to point out that under these "general warrants" customs officials were given blanket authority to conduct general searches for goods imported to the Colonies in violation of the tax laws of the Crown. The Fourth Amendment's requirement that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized," repudiated these general warrants and "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron* v. *United States*, 275 U. S. 192, 196 (1927); *Stanford* v. *Texas*, *supra*.

We believe the statute here is equally offensive. First, as we have mentioned, eavesdropping is authorized without requiring belief that any particular offense has been or is being committed; nor that the "property"

sought, the conversations, be particularly described. The purpose of the probable-cause requirement of the Fourth Amendment, to keep the state out of constitutionally protected areas until it has reason to believe that a specific crime has been or is being committed, is thereby wholly aborted. Likewise the statute's failure to describe with particularity the conversations sought gives the officer a roving commission to "seize" any and all conversations. It is true that the statute requires the naming of "the person or persons whose communications, conversations or discussions are to be overheard or recorded . . . ." But this does no more than identify the person whose constitutionally protected area is to be invaded rather than "particularly describing" the communications, conversations, or discussions to be seized. As with general warrants this leaves too much to the discretion of the officer executing the order. Secondly, authorization of eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. Prompt execution is also avoided. During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime under investigation. Moreover, the statute permits, and there were authorized here, extensions of the original two-month period—presumably for two months each—on a mere showing that such extension is "in the public interest." Apparently the original grounds on which the eavesdrop order was initially issued also form the basis of the renewal. This we believe insufficient without a showing of present probable cause for the continuance of the eavesdrop. Third, the statute places no termination date on the eavesdrop once the conversation sought is

seized. This is left entirely in the discretion of the officer. Finally, the statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits unconsented entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice, would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized. Nor does the statute provide for a return on the warrant thereby leaving full discretion in the officer as to the use of seized conversations of innocent as well as guilty parties. In short, the statute's blanket grant of permission to eavesdrop is without adequate judicial supervision or protective procedures.

## VI.

It is said with fervor that electronic eavesdropping is a most important technique of law enforcement and that outlawing it will severely cripple crime detection. The monumental report of the President's Commission on Law Enforcement and Administration of Justice entitled "The Challenge of Crime in a Free Society" informs us that the majority of law enforcement officials say that this is especially true in the detection of organized crime. As the Commission reports, there can be no question about the serious proportions of professional criminal activity in this country. However, we have found no empirical statistics on the use of electronic devices (bugging) in the fight against organized crime. Indeed, there are even figures available in the wiretap category which indicate to the contrary. See District Attorney Silver's Poll of New York Prosecutors, in Dash, Schwartz & Knowlton, The Eavesdroppers 105, 117–119

(1959). Also see Semerjian, Proposals on Wiretapping in Light of Recent Senate Hearings, 45 B. U. L. Rev. 217, 229. As the Commission points out, "[w]iretapping was the mainstay of the New York attack against organized crime until Federal court decisions intervened. Recently chief reliance in some offices has been placed on bugging, where the information is to be used in court. Law enforcement officials believe that the successes achieved in some parts of the State are attributable primarily to a combination of dedicated and competent personnel and adequate legal tools; and that the failure to do more in New York has resulted primarily from the failure to commit additional resources of time and men," rather than electronic devices. At 201–202. Moreover, Brooklyn's District Attorney Silver's poll of the State of New York indicates that during the 12-year period (1942–1954) duly authorized wiretaps in bribery and corruption cases constituted only a small percentage of the whole. It indicates that this category involved only 10% of the total wiretaps. The overwhelming majority were in the categories of larceny, extortion, coercion, and blackmail, accounting for almost 50%. Organized gambling was about 11%. Statistics are not available on subsequent years. Dash, Schwartz & Knowlton, *supra,* at 40.

An often repeated statement of District Attorney Hogan of New York County was made at a hearing before the Senate Judiciary Committee at which he advocated the amendment of the Communications Act of 1934, *supra,* so as to permit "telephonic interception" of conversations. As he testified, "Federal statutory law [the 1934 Act] has been interpreted in such a way as to bar us from divulging wiretap evidence, even in the courtroom in the course of criminal prosecution." Mr. Hogan then said that "[w]ithout it [wiretaps] my own office could not have convicted" "top figures in

the underworld." He then named nine persons his office had convicted and one on whom he had furnished "leads" secured from wiretaps to the authorities of New Jersey. Evidence secured from wiretaps, as Mr. Hogan said, was not admissible in "criminal prosecutions." He was advocating that the Congress adopt a measure that would make it admissible; Hearings on S. 2813 and S. 1495, before the Senate Committee on the Judiciary, 87th Cong., 2d Sess., pp. 173, 174 (1962). The President's Commission also emphasizes in its report the need for wiretapping in the investigation of organized crime because of the telephone's "relatively free use" by those engaged in the business and the difficulty of infiltrating their organizations. P. 201. The Congress, though long importuned, has not amended the 1934 Act to permit it.

We are also advised by the Solicitor General of the United States that the Federal Government has abandoned the use of electronic eavesdropping for "prosecutorial purposes." See Supplemental Memorandum, *Schipani* v. *United States,* No. 504, October Term, 1966, 385 U. S. 372. See also *Black* v. *United States,* 385 U. S. 26 (1966); *O'Brien* v. *United States,* 386 U. S. 345 (1967); *Hoffa* v. *United States,* 387 U. S. 231 (1967); *Markis* v. *United States,* 387 U. S. 425; *Moretti* v. *United States,* 387 U. S. 425. Despite these actions of the Federal Government there has been no failure of law enforcement in that field.

As The Chief Justice said in concurring in the result in *Lopez* v. *United States,* 373 U. S. 427, "the fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; . . . indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments . . . ." At 441.

In any event we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement.

This is no formality that we require today but a fundamental rule that has long been recognized as basic to the privacy of every home in America. While "[t]he requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement," *Lopez* v. *United States, supra,* at 464 (dissenting opinion of BRENNAN, J.), it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be developed that will operate just as speedily and certainly and—what is more important—without attending illegality.

It is said that neither a warrant nor a statute authorizing eavesdropping can be drawn so as to meet the Fourth Amendment's requirements. If that be true then the "fruits" of eavesdropping devices are barred under the Amendment. On the other hand this Court has in the past, under specific conditions and circumstances, sustained the use of eavesdropping devices. See *Goldman* v. *United States,* 316 U. S. 129; *On Lee* v. *United States,* 343 U. S. 747; *Lopez* v. *United States, supra;* and *Osborn* v. *United States, supra.* In the latter case the eavesdropping device was permitted where the "commission of a specific offense" was charged, its use was "under the most precise and discriminate circumstances" and the effective administration of justice in a federal court was at stake. The States are under no greater restrictions. The Fourth Amendment does not make the "precincts of the home or the office . . . sanctuaries where the law can never reach," DOUGLAS, J., dissenting in *Warden,*

*Maryland Penitentiary* v. *Hayden,* 387 U. S. 294, 321, but it does prescribe a constitutional standard that must be met before official invasion is permissible. Our concern with the statute here is whether its language permits a trespassory invasion of the home or office, by general warrant, contrary to the command of the Fourth Amendment. As it is written, we believe that it does.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

I join the opinion of the Court because at long last it overrules *sub silentio Olmstead* v. *United States,* 277 U. S. 438, and its offspring and brings wiretapping and other electronic eavesdropping fully within the purview of the Fourth Amendment. I also join the opinion because it condemns electronic surveillance, for its similarity to the general warrants out of which our Revolution sprang and allows a discreet surveillance only on a showing of "probable cause." These safeguards are minimal if we are to live under a regime of wiretapping and other electronic surveillance.

Yet there persists my overriding objection to electronic surveillance, *viz.,* that it is a search for "mere evidence" which, as I have maintained on other occasions (*Osborn* v. *United States,* 385 U. S. 323, 349–354), is a violation of the Fourth and Fifth Amendments, no matter with what nicety and precision a warrant may be drawn, a proposition that I developed in detail in my dissent in *Warden* v. *Hayden,* 387 U. S. 294, 312, decided only the other day.

A discreet selective wiretap or electronic "bugging" is of course not rummaging around, collecting everything in the particular time and space zone. But even though it is limited in time, it is the greatest of all invasions of privacy. It places a government agent in the bedroom, in the business conference, in the social hour, in the

lawyer's office—everywhere and anywhere a "bug" can be placed.

If a statute were to authorize placing a policeman in every home or office where it was shown that there was probable cause to believe that evidence of crime would be obtained, there is little doubt that it would be struck down as a bald invasion of privacy, far worse than the general warrants prohibited by the Fourth Amendment. I can see no difference between such a statute and one authorizing electronic surveillance, which, in effect, places an invisible policeman in the home. If anything, the latter is more offensive because the homeowner is completely unaware of the invasion of privacy.

The traditional wiretap or electronic eavesdropping device constitutes a dragnet, sweeping in all conversations within its scope—without regard to the participants or the nature of the conversations. It intrudes upon the privacy of those not even suspected of crime and intercepts the most intimate of conversations. Thus, in the *Coplon* case (*United States* v. *Coplon,* 91 F. Supp. 867, rev'd, 191 F. 2d 749) wiretaps of the defendant's home and office telephones recorded conversations between the defendant and her mother, a quarrel between a husband and wife who had no connection with the case, and conferences between the defendant and her attorney concerning the preparation of briefs, testimony of government witnesses, selection of jurors and trial strategy. Westin, The Wire-Tapping Problem: An Analysis and a Legislative Proposal, 52 Col. L. Rev. 165, 170–171 (1952); Barth, The Loyalty of Free Men 173 (1951). It is also reported that the FBI incidentally learned about an affair, totally unrelated to espionage, between the defendant and a Justice Department attorney. Barth, *supra,* at 173. While tapping one telephone, police recorded conversations involving, at the other end, The Juilliard School of Music, Brooklyn Law School,

Consolidated Radio Artists, Western Union, Mercantile Commercial Bank, several restaurants, a real estate company, a drug store, many attorneys, an importer, a dry cleaning establishment, a number of taverns, a garage, and the Prudential Insurance Company. Westin, *supra*, at 188, n. 112. These cases are but a few of many demonstrating the sweeping nature of electronic total surveillance as we know it today.

It is, of course, possible for a statute to provide that wiretap or electronic eavesdrop evidence is admissible only in a prosecution for the crime to which the showing of probable cause related. See Nev. Rev. Stat. § 200.680 (1963). But such a limitation would not alter the fact that the order authorizes a general search. Whether or not the evidence obtained is used at a trial for another crime, the privacy of the individual has been infringed by the interception of all of his conversations. And, even though the information is not introduced as evidence, it can and probably will be used as leads and background information. Again, a statute could provide that evidence developed from eavesdrop information could not be used at trial. Cf. *Silverthorne Lumber Co., Inc. v. United States,* 251 U. S. 385, 392; *Nardone v. United States,* 308 U. S. 338; *Silverman v. United States,* 365 U. S. 505. But, under a regime of total surveillance, where a multitude of conversations are recorded, it would be very difficult to show which aspects of the information had been used as investigative information.

As my Brother WHITE says in his dissent, this same vice inheres in any search for tangible evidence such as invoices, letters, diaries, and the like. "In searching for seizable matters, the police must necessarily see or hear, and comprehend, items which do not relate to the purpose of the search." That is precisely why the Fourth Amendment made any such rummaging around uncon-

stitutional, even though supported by a formally adequate warrant. That underwrites my dissent in *Hayden*.

With all respect, my Brother Black misses the point of the Fourth Amendment. It does not make every search constitutional provided there is a warrant that is technically adequate. The history of the Fourth Amendment, as I have shown in my dissent in the *Hayden* case, makes it plain that any search in the precincts of the home for personal items that are lawfully possessed and not articles of a crime is "unreasonable." That is the essence of the "mere evidence" rule that long obtained until overruled by *Hayden*.

The words that a man says consciously on a radio are public property. But I do not see how government using surreptitious methods can put a person on the radio and use his words to convict him. Under our regime a man stands mute if he chooses, or talks if he chooses. The test is whether he acts voluntarily. That is the essence of the face of privacy protected by the "mere evidence" rule. For the Fourth Amendment and the Fifth come into play when the accused is "the unwilling source of the evidence" (*Gouled* v. *United States*, 255 U. S. 298, 306), there being no difference "whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers." *Ibid.*

That is the essence of my dissent in *Hayden*. In short, I do not see how any electronic surveillance that collects evidence or provides leads to evidence is or can be constitutional under the Fourth and Fifth Amendments. We could amend the Constitution and so provide—a step that would take us closer to the ideological group we profess to despise. Until the amending process ushers us into that kind of totalitarian regime, I would adhere to the protection of privacy which the Fourth Amendment, fashioned in Congress and submitted to the people,

was designed to afford the individual. And unlike my Brother BLACK, I would adhere to *Mapp* v. *Ohio*, 367 U. S. 643, and apply the exclusionary rule in state as well as federal trials—a rule fashioned out of the Fourth Amendment and constituting a high constitutional barricade against the intrusion of Big Brother into the lives of all of us.

MR. JUSTICE STEWART, concurring in the result.

I fully agree with MR. JUSTICE BLACK, MR. JUSTICE HARLAN, and MR. JUSTICE WHITE that this New York law is entirely constitutional. In short, I think that "electronic eavesdropping, *as such* or as it is permitted by this statute, is not an unreasonable search and seizure." [1] The statute contains many provisions more stringent than the Fourth Amendment generally requires, as MR. JUSTICE BLACK has so forcefully pointed out. And the petitioner himself has told us that the law's "reasonable grounds" requirement "is undisputedly equivalent to the probable cause requirement of the Fourth Amendment." This is confirmed by decisions of the New York courts. *People* v. *Cohen*, 42 Misc. 2d 403, 248 N. Y. S. 2d 339; *People* v. *Beshany*, 43 Misc. 2d 521, 252 N. Y. S. 2d 110; *People* v. *Grossman*, 45 Misc. 2d 557, 257 N. Y. S. 2d 266. Of course, a state court's construction of a state statute is binding upon us.

In order to hold this statute unconstitutional, therefore, we would have to either rewrite the statute or rewrite the Constitution. I can only conclude that the Court today seems to have rewritten both.

The issue before us, as MR. JUSTICE WHITE says, is "whether *this* search complied with Fourth Amendment standards." For me that issue is an extremely close one

---

[1] Dissenting opinion of MR. JUSTICE HARLAN, *post*, p. 89, at 94.

in the circumstances of this case. It certainly cannot be resolved by incantation of ritual phrases like "general warrant." Its resolution involves "the unavoidable task in any search and seizure case: was the particular search and seizure reasonable or not?" [2]

I would hold that the affidavits on which the judicial order issued in this case did not constitute a showing of probable cause adequate to justify the authorizing order. The need for particularity and evidence of reliability in the showing required when judicial authorization is sought for the kind of electronic eavesdropping involved in this case is especially great. The standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion. By its very nature electronic eavesdropping for a 60-day period, even of a specified office, involves a broad invasion of a constitutionally protected area. Only the most precise and rigorous standard of probable cause should justify an intrusion of this sort. I think the affidavits presented to the judge who authorized the electronic surveillance of the Steinman office failed to meet such a standard.

So far as the record shows, the only basis for the Steinman order consisted of two affidavits. One of them contained factual allegations supported only by bare, unexplained references to "evidence" in the district attorney's office and "evidence" obtained by the Neyer eavesdrop. No underlying facts were presented on the basis of which the judge could evaluate these general allegations. The second affidavit was no more than a statement of another assistant district attorney that he had read his associate's affidavit and was satisfied on that basis alone that proper grounds were presented for the issuance of an authorizing order.

---

[2] See dissenting opinion of MR. JUSTICE BLACK, *post*, p. 70, at 83.

This might be enough to satisfy the standards of the Fourth Amendment for a conventional search or arrest. Cf. *Aguilar* v. *Texas*, 378 U. S. 108, 116 (dissenting opinion). But I think it was constitutionally insufficient to constitute probable cause to justify an intrusion of the scope and duration that was permitted in this case.

Accordingly, I would reverse the judgment.

MR. JUSTICE BLACK, dissenting.

New York has an eavesdropping statute which permits its judges to authorize state officers to place on other people's premises electronic devices that will overhear and record telephonic and other conversations for the purpose of detecting secret crimes and conspiracies and obtaining evidence to convict criminals in court. Judges cannot issue such eavesdropping permits except upon oath or affirmation of certain state officers that "there is reasonable ground to believe that evidence of crime may be thus obtained, and particularly describing the person or persons whose communications, conversations or discussions are to be overheard or recorded, and the purpose thereof . . . ." N. Y. Code Crim. Proc. § 813–a. Evidence obtained by such electronic eavesdropping was used to convict the petitioner here of conspiracy to bribe the chairman of the State Liquor Authority which controls the issuance of liquor licenses in New York. It is stipulated that without this evidence a conviction could not have been obtained, and it seems apparent that use of that evidence showed petitioner to be a briber beyond all reasonable doubt. Notwithstanding petitioner's obvious guilt, however, the Court now strikes down his conviction in a way that plainly makes it impossible ever to convict him again. This is true because the Court not only holds that the judicial orders which were the basis of the authority to eavesdrop were insufficient, but also

holds that the New York eavesdropping statute is *on its face* violative of the Fourth Amendment. And while the Court faintly intimates to the contrary, it seems obvious to me that its holding, by creating obstacles that cannot be overcome, makes it completely impossible for the State or the Federal Government ever to have a valid eavesdropping statute. All of this is done, it seems to me, in part because of the Court's hostility to eavesdropping as "ignoble" and "dirty business"[1] and in part because of fear that rapidly advancing science and technology is making eavesdropping more and more effective. Cf. *Lopez* v. *United States*, 373 U. S. 427, 446 (dissenting opinion of BRENNAN, J.). Neither these, nor any other grounds that I can think of, are sufficient in my judgment to justify a holding that the use of evidence secured by eavesdropping is barred by the Constitution.

## I.

Perhaps as good a definition of eavesdropping as another is that it is listening secretly and sometimes "snoopily" to conversations and discussions believed to be private by those who engage in them. Needless to say, eavesdropping is not ranked as one of the most learned or most polite professions, nor perhaps would an eavesdropper be selected by many people as the most desirable and attractive associate. But the practice has undoubtedly gone on since the beginning of human society, and during that time it has developed a usefulness of its own, particularly in the detection and prosecution of crime.

Eavesdroppers have always been deemed competent witnesses in English and American courts. The main test of admissibility has been relevance and first-hand

---

[1] Mr. Justice Holmes dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 470.

knowledge, not by whom or by what method proffered evidence was obtained. It is true that in England people who obtained evidence by unlawful means were held liable in damages as in *Entick* v. *Carrington,* 19 How. St. Tr. 1029. But even that famous civil liberties case made no departure from the traditional common-law rule that relevant evidence is admissible, even though obtained contrary to ethics, morals, or law. And, for reasons that follow, this evidentiary rule is well adapted to our Government, set up, as it was, to "insure domestic tranquility" under a system of laws.

Today this country is painfully realizing that evidence of crime is difficult for governments to secure. Criminals are shrewd and constantly seek, too often successfully, to conceal their tracks and their outlawry from law officers. But in carrying on their nefarious practices professional criminals usually talk considerably. Naturally, this talk is done, they hope, in a secret way that will keep it from being heard by law enforcement authorities or by others who might report to the authorities. In this situation "eavesdroppers," "informers," and "squealers," as they are variously called, are helpful, even though unpopular, agents of law enforcement. And it needs no empirical studies or statistics to establish that eavesdropping testimony plays an important role in exposing criminals and bands of criminals who but for such evidence would go along their criminal way with little possibility of exposure, prosecution, or punishment. Such, of course, is this particular case before us.

The eavesdrop evidence here shows this petitioner to be a briber, a corrupter of trusted public officials, a poisoner of the honest administration of government, upon which good people must depend to obtain the blessings of a decent orderly society. No man's privacy, property, liberty, or life is secure, if organized or even unorganized criminals can go their way unmolested, ever

and ever further in their unbounded lawlessness. However obnoxious eavesdroppers may be they are assuredly not engaged in a more "ignoble" or "dirty business" than are bribers, thieves, burglars, robbers, rapists, kidnapers, and murderers, not to speak of others. And it cannot be denied that to deal with such specimens of our society, eavesdroppers are not merely useful, they are frequently a necessity. I realize that some may say, "Well, let the prosecuting officers use more scientific measures than eavesdropping." It is always easy to hint at mysterious means available just around the corner to catch outlaws. But crimes, unspeakably horrid crimes, are with us in this country, and we cannot afford to dispense with any known method of detecting and correcting them unless it is forbidden by the Constitution or deemed inadvisable by legislative policy—neither of which I believe to be true about eavesdropping.

## II.

Since eavesdrop evidence obtained by individuals is admissible and helpful I can perceive no permissible reason for courts to reject it, even when obtained surreptitiously by machines, electronic or otherwise. Certainly evidence picked up and recorded on a machine is not less trustworthy. In both perception and retention a machine is more accurate than a human listener. The machine does not have to depend on a defective memory to repeat what was said in its presence for it repeats the very words uttered. I realize that there is complaint that sometimes the words are jumbled or indistinct. But machine evidence need not be done away with to correct such occasional defective recording. The trial judge has ample power to refuse to admit indistinct or garbled recordings.

The plain facts are, however, that there is no inherent danger to a defendant in using these electronic record-

ings except that which results from the use of testimony that is so unerringly accurate that it is practically bound to bring about a conviction. In other words, this kind of transcribed eavesdropping evidence is far more likely to lead a judge or jury to reach a correct judgment or verdict—the basic and always-present objective of a trial.

## III.

The superior quality of evidence recorded and transcribed on an electronic device is, of course, no excuse for using it against a defendant, if, as the Court holds, its use violates the Fourth Amendment. If that is true, no amount of common-law tradition or anything else can justify admitting such evidence. But I do not believe the Fourth Amendment, or any other, bans the use of evidence obtained by eavesdropping.

There are constitutional amendments that speak in clear unambiguous prohibitions or commands. The First, for illustration, declares that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." The Fifth declares that a person shall not be held to answer for a capital or otherwise infamous crime except on a grand jury indictment; shall not twice be put in jeopardy of life or limb for the same offense; nor be compelled in any criminal case to be a witness against himself. These provisions of the First and Fifth Amendments, as well as others I need not mention at this time, are clear unconditional commands that something shall not be done. Particularly of interest in comparison with the Fourth Amendment is the Fifth Amendment's prohibition against compelling a person to be a witness against himself. The Fifth Amendment's language forbids a court to hear evidence against a person that he has been compelled to give, without regard to reasonableness or anything else. Unlike all of these just-named Fifth Amendment provisions, the Fourth Amend-

ment relating to searches and seizures contains no such unequivocal commands. It provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Obviously, those who wrote this Fourth Amendment knew from experience that searches and seizures were too valuable to law enforcement to prohibit them entirely, but also knew at the same time that while searches or seizures must not be stopped, they should be slowed down, and warrants should be issued only after studied caution. This accounts for use of the imprecise and flexible term, "unreasonable," the key word permeating this whole Amendment. Also it is noticeable that this Amendment contains no appropriate language, as does the Fifth, to forbid the use and introduction of search and seizure evidence even though secured "unreasonably." Nor does this Fourth Amendment attempt to describe with precision what was meant by its words, "probable cause"; nor by whom the "Oath or affirmation" should be taken; nor what it need contain. Although the Amendment does specifically say that the warrant should particularly describe "the place to be searched, and the persons or things to be seized," it does not impose any precise limits on the spatial or temporal extent of the search or the quantitative extent of the seizure. Thus this Amendment, aimed against only "unreasonable" searches and seizures, seeks to guard against them by providing, as the Court says, that a "neutral and detached authority be interposed between the police and the public, *Johnson* v. *United States,* 333 U. S. 10,

14." And, as the Court admits, the Amendment itself provides no sanctions to enforce its standards of searches, seizures, and warrants. This was left for Congress to carry out if it chose to do so.

Had the framers of this Amendment desired to prohibit the use in court of evidence secured by an unreasonable search or seizure, they would have used plain appropriate language to do so, just as they did in prohibiting the use of enforced self-incriminatory evidence in the Fifth Amendment. Since the Fourth Amendment contains no language forbidding the use of such evidence, I think there is no such constitutional rule. So I continue to believe that the exclusionary rule formulated to bar such evidence in the *Weeks* [2] case is not rooted in the Fourth Amendment but rests on the "supervisory power" of this Court over the other federal courts—the same judicial power invoked in *McNabb* v. *United States,* 318 U. S. 332. See my concurring opinions in *Wolf* v. *Colorado,* 338 U. S. 25, 39, and *Mapp* v. *Ohio,* 367 U. S. 643, 661.[3] For these reasons and others to be stated, I do not believe the Fourth Amendment standing alone, even if applicable to electronic eavesdropping, commands exclusion of the overheard evidence in this case.

In reaching my conclusion that the Fourth Amendment itself does not bar the use of eavesdropping evidence in courts, I do not overlook the fact that the Court at present is reading the Amendment as expressly and unqualifiedly barring invasions of "privacy" rather than merely forbidding "unreasonable searches and seizures."

---

[2] *Weeks* v. *United States,* 232 U. S. 383. Compare *Adams* v. *New York,* 192 U. S. 585.

[3] I concurred in *Mapp* because "[t]he close interrelationship between the Fourth and Fifth Amendments," 367 U. S., at 662, as they applied to the facts of that case required the exclusion there of the unconstitutionally seized evidence.

On this premise of the changed command of the Amendment, the Court's task in passing on the use of eavesdropping evidence becomes a simple one. Its syllogism is this:

> The Fourth Amendment forbids invasion of privacy and excludes evidence obtained by such invasion;
>
> To listen secretly to a man's conversations or to tap his telephone conversations invades his privacy;
>
> Therefore, the Fourth Amendment bars use of evidence obtained by eavesdropping or by tapping telephone wires.

The foregoing syllogism is faulty for at least two reasons: (1) the Fourth Amendment itself contains no provision from which can be implied a purpose to bar evidence or anything else secured by an "unreasonable search or seizure"; (2) the Fourth Amendment's language, fairly construed, refers specifically to "unreasonable searches and seizures" and not to a broad undefined right to "privacy" in general. To attempt to transform the meaning of the Amendment, as the Court does here, is to play sleight-of-hand tricks with it. It is impossible for me to think that the wise Framers of the Fourth Amendment would ever have dreamed about drafting an amendment to protect the "right of privacy." That expression, like a chameleon, has a different color for every turning. In fact, use of "privacy" as the keyword in the Fourth Amendment simply gives this Court a useful new tool, as I see it, both to usurp the policy-making power of the Congress and to hold more state and federal laws unconstitutional when the Court entertains a sufficient hostility to them. I therefore cannot agree to hold New York's law unconstitutional on the premise that all laws that unreasonably invade privacy violate the Fourth Amendment.

## IV.

While the electronic eavesdropping here bears some analogy to the problems with which the Fourth Amendment is concerned, I am by no means satisfied that the Amendment controls the constitutionality of such eavesdropping. As pointed out, the Amendment only bans searches and seizures of "persons, houses, papers, and effects." This literal language imports tangible things, and it would require an expansion of the language used by the framers, in the interest of "privacy" or some equally vague judge-made goal, to hold that it applies to the spoken word. It simply requires an imaginative transformation of the English language to say that conversations can be searched and words seized. Referring to wiretapping, this Court in *Olmstead* v. *United States,* 277 U. S. 438, 465, refused to make that transformation:

> "Justice Bradley in the *Boyd* case, and Justice Clark[e] in the *Gouled* case, said that the Fifth Amendment and the Fourth Amendment were to be liberally construed . . . . But that can not justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight."

Though *Olmstead* has been severely criticized by various individual members of this Court, and though the Court stated an alternative ground for holding the Amendment inapplicable in that case, the *Olmstead* holding that the Fourth Amendment does not apply to efforts to hear and obtain oral conversations has never been overruled by this Court. The Court today, however, suggests that this holding has been "negated" by subsequent congressional action and by four decisions of this Court. First, the Court intimates, though it does not exactly

state, that Congress "in answer to *Olmstead*," passed an Act to prohibit "the interception without authorization and the divulging or publishing of the contents of telephonic communications." The Court cites no authority for this strange surmise, and I assert with confidence that none can be recited. And even if it could, Congress' action would not have the slightest relevance to the scope of the Fourth Amendment. Second, the Court cites *Goldman* v. *United States,* 316 U. S. 129, and *On Lee* v. *United States,* 343 U. S. 747, in an effort to explain away *Olmstead*. But neither of those cases purported to repudiate the *Olmstead* case or any part of it. In fact, in both of those cases the Court refused to exclude the challenged eavesdrop evidence. Finally, the Court relies on *Silverman* v. *United States,* 365 U. S. 505, and *Wong Sun* v. *United States,* 371 U. S. 471. In both of these cases the Court did imply that the "Fourth Amendment *may* protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects,' " 371 U. S., at 485 (emphasis added), but in neither did the Court find it necessary to overrule *Olmstead,* an action that would have been required had the Court based its exclusion of the oral conversations solely on the ground of the Fourth Amendment. The fact is that both *Silverman* and *Wong Sun* were federal cases dealing with the use of verbal evidence in federal courts, and the Court held the evidence should be excluded by virtue of the exclusionary rule of the *Weeks* case. As I have previously pointed out, that rule rested on the Court's supervisory power over federal courts, not on the Fourth Amendment: it is not required by the Amendment, nor is a violation of the Amendment a prerequisite to its application. I would not have agreed with the Court's opinion in *Silverman,* which, by the way, cited *Olmstead* with approval, had I

thought that the result depended on finding a violation of the Fourth Amendment or had I any inkling that the Court's general statements about the scope of the Amendment were intended to negate the clear holding of *Olmstead*. And again in *Wong Sun,* which did not even mention *Olmstead,* let alone overrule it, the Court clearly based its exclusion of oral statements made to federal agents during an illegal arrest on its supervisory power to deter lawless conduct by federal officers and on the alternative ground that the incriminating statements were made under compulsive circumstances and were not the product of a free will. It is impossible for me to read into that noneavesdropping federal case an intent to overrule *Olmstead* implicitly. In short, the only way this Court can escape *Olmstead* here is to overrule it. Without expressly saying so, the Court's opinion, as my Brother Douglas acknowledges, does just that. And that overruling is accomplished by the simple expedient of substituting for the Amendment's words, "The right of the people to be secure in their persons, houses, papers, and effects," the words "The right of the people to be secure in their privacy," words the Court believes the Framers should have used, but did not. I have frequently stated my opposition to such judicial substitution. Although here the Court uses it to expand the scope of the Fourth Amendment to include words, the Court has been applying the same process to contract the Fifth Amendment's privilege against self-incrimination so as to exclude all types of incriminating evidence but words, or what the Court prefers to call "testimonial evidence." See *United States* v. *Wade, post,* p. 218; *Gilbert* v. *California, post,* p. 263.

There is yet another reason why I would adhere to the holding of *Olmstead* that the Fourth Amendment does not apply to eavesdropping. Since the Framers in the first clause of the Amendment specified that only persons,

houses, and things were to be protected, they obviously wrote the second clause, regulating search warrants, in reference only to such tangible things. To hold, as the Court does, that the first clause protects words, necessitates either a virtual rewriting of the particularity requirements of the Warrant Clause or a literal application of that clause's requirements and our cases construing them to situations they were never designed to cover. I am convinced that the Framers of the Amendment never intended this Court to do either, and yet it seems to me clear that the Court here does a little of both.

## V.

Assuming, as the Court holds, that the Fourth Amendment applies to eavesdropping and that the evidence obtained by an eavesdrop which violates the Fourth Amendment must be excluded in state courts, I disagree with the Court's holding that the New York statute on its face fails to comport with the Amendment. I also agree with my Brother WHITE that the statute as here applied did not violate any of petitioner's Fourth Amendment rights—assuming again that he has some—and that he is not entitled to a reversal of his conviction merely because the statute might have been applied in some way that would not have accorded with the Amendment.

This case deals only with a trespassory eavesdrop, an eavesdrop accomplished by placing "bugging" devices in certain offices. Significantly, the Court does not purport to disturb the *Olmstead-Silverman-Goldman* distinction between eavesdrops which are accompanied by a physical invasion and those that are not. Neither does the Court purport to overrule the holdings of *On Lee* v. *United States,* 343 U. S. 747, and *Lopez* v. *United States,* 373 U. S. 427, which exempt from the Amendment's requirements the use of an electronic device to record, and perhaps even transmit, a conversation to

which the user is a party. It is thus clear that at least certain types of electronic eavesdropping, until today, were completely outside the scope of the Fourth Amendment. Nevertheless, New York has made it a crime to engage in almost any kind of electronic eavesdropping, N. Y. Pen. Law § 738, and the only way eavesdropping, even the kind this Court has held constitutional, can be accomplished with immunity from criminal punishment is pursuant to § 813–a of the Code of Criminal Procedure, N. Y. Pen. Law § 739. The Court now strikes down § 813–a in its entirety, and that may well have the result of making it impossible for state law enforcement officers merely to listen through a closed door by means of an inverted cone or some other crude amplifying device, eavesdropping which this Court has to date refused to hold violative of the Fourth Amendment. Certainly there is no justification for striking down completely New York's statute, covering all kinds of eavesdropping, merely because it fails to contain the "strict precautions" which the Court derives—or more accurately fabricates— as conditions to eavesdrops covered by the Fourth Amendment. In failing to distinguish between types of eavesdropping and in failing to make clear that the New York statute is invalid only as applied to certain kinds of eavesdropping, the Court's opinion leaves the definite impression that all eavesdropping is governed by the Fourth Amendment. Such a step would require overruling of almost every opinion this Court has ever written on the subject. Indeed, from the Court's eavesdropping catalogue of horrors—electronic rays beamed at walls, lapel and cuff-link microphones, and off-premise parabolic microphones—it does not take too much insight to see that the Court is about ready to do, if it has not today done, just that.

I agree with my Brother WHITE that instead of looking for technical defects in the language of the New

York statute, the Court should examine the actual circumstances of its application in this case to determine whether petitioner's rights have here been violated. That to me seems to be the unavoidable task in any search and seizure case: was the particular search and seizure reasonable or not? We have just this Term held that a search and seizure without a warrant and even without authorization of state law, can nevertheless, under all the circumstances, be "reasonable" for Fourth Amendment purposes. *Cooper* v. *California,* 386 U. S. 58. I do not see why that could not be equally true in the case of a search and seizure with a warrant and pursuant to a state law, even though the state law is itself too broad to be valid. Certainly a search and seizure may comply with the Fourth Amendment even in the absence of an authorizing statute which embodies the Amendment's requirements. *Osborn* v. *United States,* 385 U. S. 323, upon which the Court so heavily relies, is a good example of a case where the Court sustained the tape recording of a conversation by examining the particular circumstances surrounding it, even though no federal statute prescribed the precautions taken by the district judges there. Here New York has gone much further than the Federal Government and most of the States to outlaw all eavesdropping except under the limited circumstances of § 813–a, a statute which, as I shall demonstrate, contains many more safeguards than the Fourth Amendment itself. But today New York fares far worse than those States which have done nothing to implement and supplement the Fourth Amendment: it must release a convicted criminal, not because it has deprived him of constitutional rights, but because it has inartfully (according to the Court) tried to guarantee him those rights. The New York statute aside, the affidavits in this case were sufficient to justify a finding of probable cause, and the *ex parte* eavesdrop orders identified the

person whose conversations were to be overheard, the place where the eavesdropping was to take place, and, when read in reference to the supporting affidavits, the type of conversations sought, *i. e.,* those relating to extortion and bribery.

The Court concludes its analysis of § 813–a by asserting that "the statute's blanket grant of permission to eavesdrop is without adequate judicial supervision or protective procedures." Even if the Court's fear that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices" justifies it in rewriting the Fourth Amendment to impose on eavesdroppers "strict precautions" which are not imposed on other searchers, it is an undeserved criticism of New York to characterize its studied efforts to regulate eavesdropping as resulting in a statute "without adequate judicial supervision or protective procedures." Let us look at the New York statute. It provides:

> (1) New York judges are to issue authorizations. (The Fourth Amendment does not command any such desirable judicial participation.)
>
> (2) The judge must have an "oath" from New York officials. (The Fourth Amendment does not specify who must execute the oath it requires.)
>
> (3) The oath must state "reasonable ground to believe that evidence of crime may be thus obtained," and the judge may examine the affiant and any other witnesses to make certain that this is the case. (The Fourth Amendment requires a showing of "probable cause," but the Court does not dispute New York's assertion that "reasonable ground" and "probable cause" are the same. The Amendment does not specify, as the New York statute does, a procedure by which the judge may "satisfy himself" of the existence of probable cause.)

(4) The "person or persons whose communications, conversations or discussions are to be overheard or recorded and the purpose thereof" must be particularly described. (In the case of conversation it would seem impossible to require a more particular description than this. Tangible things in existence at the time a warrant for their seizure is issued could be more particularly described, but the only way to describe future conversations is by a description of the anticipated subject matter of the conversation. When the "purpose" of the eavesdropping is stated, the subject of the conversation sought to be seized is readily recognizable. Nothing more was required in *Osborn;* nothing more should be required here.)

(5) The eavesdrop order must be limited in time to no more than two months. (The Fourth Amendment merely requires that the place to be searched be described. It does not require the warrant to limit the time of a search, and it imposes no limit, other than that of reasonableness, on the dimensions of the place to be searched.)

Thus, it seems impossible for the Court to condemn this statute on the ground that it lacks "adequate judicial supervision or protective procedures." Rather, the only way the Court can invalidate it is to find it lacking in some of the safeguards which the Court today fashions without any reference to the language of the Fourth Amendment whatsoever. In fact, from the deficiencies the Court finds in the New York statute, it seems that the Court would be compelled to strike down a state statute which merely tracked verbatim the language of the Fourth Amendment itself. First, the Court thinks the affidavits or the orders must particularize the crime being committed. The Fourth Amendment's particularity requirement relates to the place searched and the

thing seized, not to the crime being committed. Second, the Court holds that two months for an eavesdrop order to be outstanding is too long. There are, however, no time limits of any kind in the Fourth Amendment other than the notion that a search should not last longer than reasonably necessary to search the place described in the warrant, and the extent of that place may also be limited by the concept of reasonableness. The Court does not explain why two months, regardless of the circumstances, is *per se* an unreasonable length of time to accomplish a verbal search. Third, the Court finds the statute deficient in not providing for a termination of the eavesdrop once the object is obtained and in not providing for a return of the warrant at that time. Where in the Fourth Amendment does the Court think it possible to find these requirements? Finally, the Court makes the fantastic suggestion that the eavesdropper must give notice to the person whose conversation is to be overheard or that the eavesdropper must show "exigent circumstances" before he can perform his eavesdrop without consent. Now, if never before, the Court's purpose is clear: it is determined to ban all eavesdropping. As the Court recognizes, eavesdropping "necessarily . . . depends on secrecy." Since secrecy is an essential, indeed a definitional, element of eavesdropping, when the Court says there shall be no eavesdropping without notice, the Court means to inform the Nation there shall be no eavesdropping—period.

It should now be clear that in order to strike down the New York law the Court has been compelled to rewrite completely the Fourth Amendment. By substituting the word "privacy" for the language of the first clause of the Amendment, the Court expands the scope of the Amendment to include oral conversations; then by applying the literal particularity requirements of the second clause without adjustment for the Court's expan-

sion of the Amendment's scope, the Court makes constitutional eavesdropping improbable; and finally, by inventing requirements found in neither clause— requirements with which neither New York nor any other State can possibly comply—the Court makes such eavesdropping impossible. If the Fourth Amendment does not ban all searches and seizures, I do not see how it can possibly ban all eavesdrops.

## VI.

As I see it, the differences between the Court and me in this case rest on different basic beliefs as to our duty in interpreting the Constitution. This basic charter of our Government was written in few words to define governmental powers generally on the one hand and to define governmental limitations on the other. I believe it is the Court's duty to interpret these grants and limitations so as to carry out as nearly as possible the original intent of the Framers. But I do not believe that it is our duty to go further than the Framers did on the theory that the judges are charged with responsibility for keeping the Constitution "up to date." Of course, where the Constitution has stated a broad purpose to be accomplished under any circumstances, we must consider that modern science has made it necessary to use new means in accomplishing the Framers' goal. A good illustration of this is the Commerce Clause which gives Congress power to regulate commerce between the States however it may be carried on, whether by ox wagons or jet planes. But the Fourth Amendment gives no hint that it was designed to put an end to the age-old practice of using eavesdropping to combat crime. If changes in that Amendment are necessary, due to contemporary human reaction to technological advances, I think those changes should be accomplished by amendments, as the Constitution itself provides.

Then again, a constitution like ours is not designed to be a full code of laws as some of our States and some foreign countries have made theirs. And if constitutional provisions require new rules and sanctions to make them as fully effective as might be desired, my belief is that calls for action, not by us, but by Congress or state legislatures, vested with powers to choose between conflicting policies. Here, for illustration, there are widely diverging views about eavesdropping. Some would make it a crime, barring it absolutely and in all events; others would bar it except in searching for evidence in the field of "national security," whatever that means; still others would pass no law either authorizing or forbidding it, leaving it to follow its natural course. This is plainly the type of question that can and should be decided by legislative bodies, unless some constitutional provision *expressly* governs the matter, just as the Fifth Amendment *expressly* forbids enforced self-incrimination. There is no such express prohibition in the Fourth Amendment nor can one be implied. The Fourth Amendment can only be made to prohibit or to regulate eavesdropping by taking away some of its words and by adding others.

Both the States and the National Government are at present confronted with a crime problem that threatens the peace, order, and tranquility of the people. There are, as I have pointed out, some constitutional commands that leave no room for doubt—certain procedures must be followed by courts regardless of how much more difficult they make it to convict and punish for crime. These commands we should enforce firmly and to the letter. But my objection to what the Court does today is the picking out of a broad general provision against unreasonable searches and seizures and the erecting out of it a constitutional obstacle against electronic eavesdropping that makes it impossible for lawmakers to overcome. Honest men may rightly differ on the po-

tential dangers or benefits inherent in electronic eavesdropping and wiretapping. See *Lopez* v. *United States, supra.* But that is the very reason that legislatures, like New York's, should be left free to pass laws about the subject, rather than be told that the Constitution forbids it on grounds no more forceful than the Court has been able to muster in this case.

MR. JUSTICE HARLAN, dissenting.

The Court in recent years has more and more taken to itself sole responsibility for setting the pattern of criminal law enforcement throughout the country. Time-honored distinctions between the constitutional protections afforded against federal authority by the Bill of Rights and those provided against state action by the Fourteenth Amendment have been obliterated, thus increasingly subjecting state criminal law enforcement policies to oversight by this Court. See, *e. g., Mapp* v. *Ohio,* 367 U. S. 643; *Ker* v. *California,* 374 U. S. 23; *Malloy* v. *Hogan,* 378 U. S. 1; *Murphy* v. *Waterfront Commission,* 378 U. S. 52. Newly contrived constitutional rights have been established without any apparent concern for the empirical process that goes with legislative reform. See, *e. g., Miranda* v. *Arizona,* 384 U. S. 436. And overlying the particular decisions to which this course has given rise is the fact that, short of future action by this Court, their impact can only be undone or modified by the slow and uncertain process of constitutional amendment.

Today's decision is in this mold. Despite the fact that the use of electronic eavesdropping devices as instruments of criminal law enforcement is currently being comprehensively addressed by the Congress and various other bodies in the country, the Court has chosen, quite unnecessarily, to decide this case in a manner which will seriously restrict, if not entirely thwart, such efforts,

and will freeze further progress in this field, except as the Court may itself act or a constitutional amendment may set things right.

In my opinion what the Court is doing is very wrong, and I must respectfully dissent.

## I.

I am, at the outset, divided from the majority by the way in which it has determined to approach the case. Without pausing to explain or to justify its reasoning, it has undertaken both to circumvent rules which have hitherto governed the presentation of constitutional issues to this Court, and to disregard the construction consistently attributed to a state statute by the State's own courts. Each of these omissions is, in my opinion, most unfortunate.

The Court declares, without further explanation, that since petitioner was "affected" by § 813–a, he may challenge its validity on its face. Nothing in the cases of this Court supports this wholly ambiguous standard; the Court until now has, in recognition of the intense difficulties so wide a rule might create for the orderly adjudication of constitutional issues, limited the situations in which state statutes may be challenged on their face. There is no reason here, apart from the momentary conveniences of this case, to abandon those limitations: none of the circumstances which have before properly been thought to warrant challenges of statutes on their face is present, cf. *Thornhill* v. *Alabama,* 310 U. S. 88, 98, and no justification for additional exceptions has been offered. See generally *United States* v. *National Dairy Products Corp.,* 372 U. S. 29, 36; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 521 (dissenting opinion). Petitioner's rights, and those of others similarly situated, can be fully vindicated through the adjudication of the consistency

with the Fourteenth Amendment of each eavesdropping order.

If the statute is to be assessed on its face, the Court should at least adhere to the principle that, for purposes of assessing the validity under the Constitution of a state statute, the construction given the statute by the State's courts is conclusive of its scope and meaning. *Fox* v. *Washington,* 236 U. S. 273; *Winters* v. *New York,* 333 U. S. 507; *Poulos* v. *New Hampshire,* 345 U. S. 395. This principle is ultimately a consequence of the differences in function of the state and federal judicial systems. The strength with which it has hitherto been held may be estimated in part by the frequency with which the Court has in the past declined to adjudicate issues, often of great practical and constitutional importance, until the state courts "have been afforded a reasonable opportunity to pass upon them." *Harrison* v. *NAACP,* 360 U. S. 167, 176. See, *e. g., Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496; *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101; *Shipman* v. *DuPre,* 339 U. S. 321; *Albertson* v. *Millard,* 345 U. S. 242; *Government Employees* v. *Windsor,* 353 U. S. 364.

The Court today entirely disregards this principle. In its haste to give force to its distaste for eavesdropping, it has apparently resolved that no attention need be given to the construction of § 813–a adopted by the state courts. Apart from a brief and partial acknowledgment, spurred by petitioner's concession, that the state cases might warrant exploration, the Court has been content simply to compare the terms of the statute with the provisions of the Fourth Amendment; upon discovery that their words differ, it has concluded that the statute is constitutionally impermissible. In sharp contrast, when confronted by Fourth Amendment issues under a federal statute which did not, and does not

92

now, reproduce *ipsissimis verbis* the Fourth Amendment, 26 U. S. C. § 7607 (2), the Court readily concluded, upon the authority of cases in the courts of appeals, that the statute effectively embodied the Amendment's requirements. *Draper* v. *United States,* 358 U. S. 307, 310 n. And the Court, without the assistance even of state authorities, reached an identical conclusion as to a similar state statute in *Ker* v. *California,* 374 U. S. 23, 36 n. The circumstances of the present case do not come even within the narrow exceptions to the rule that the Court ordinarily awaits a state court's construction before adjudicating the validity of a state statute. Cf. *Dombrowski* v. *Pfister,* 380 U. S. 479; *Baggett* v. *Bullitt,* 377 U. S. 360. The Court has shown no justification for its disregard of existing and pertinent state authorities.

## II.

The Court's precipitate neglect of the New York cases is the more obviously regrettable when their terms are examined, for they make quite plain that the state courts have fully recognized the applicability of the relevant federal constitutional requirements, and that they have construed § 813–a in conformity with those requirements. Opinions of the state courts repeatedly suggest that the "reasonable grounds" prescribed by the section are understood to be synonymous with the "probable cause" demanded by the Fourth and Fourteenth Amendments. *People* v. *Cohen,* 42 Misc. 2d 403, 404, 248 N. Y. S. 2d 339, 341; *People* v. *Grossman,* 45 Misc. 2d 557, 568, 257 N. Y. S. 2d 266, 277; *People* v. *Beshany,* 43 Misc. 2d 521, 525, 252 N. Y. S. 2d 110, 115. The terms are frequently employed interchangeably, without the least suggestion of any shadings of meaning. See, *e. g., People* v. *Rogers,* 46 Misc. 2d 860, 863, 261 N. Y. S. 2d 152, 155; *People* v. *McDonough,* 51 Misc. 2d 1065, 1069, 275 N. Y. S. 2d 8, 12. Further, a lower state court

has stated quite specifically that "the same standards, at the least, must be applied" to orders under § 813–a as to warrants for the search and seizure of tangible objects. *People* v. *Cohen, supra,* at 407–408, 248 N. Y. S. 2d, at 344. Indeed, the court went on to say that the standards "should be much more stringent than those applied to search warrants." *Id.,* at 408, 248 N. Y. S. 2d, at 344. Compare *Siegel* v. *People,* 16 N. Y. 2d 330, 332, 213 N. E. 2d 682, 683. The court in *Cohen* was concerned with a wiretap order, but the order had been issued under § 813–a, and there was no suggestion there or elsewhere that eavesdropping orders should be differently treated. New York's statutory requirements for search warrants, it must be emphasized, are virtually a literal reiteration of the terms of the Fourth Amendment. N. Y. Code Crim. Proc. § 793. If the Court wished a precise invocation of the terms of the Fourth Amendment, it had only to examine the pertinent state authorities.

There is still additional evidence that the State fully recognizes the applicability to eavesdropping orders of the Fourth Amendment's constraints. The Legislature of New York adopted in 1962 comprehensive restrictions upon the use of eavesdropped information obtained without a prior § 813–a order. N. Y. Civ. Prac. § 4506. The restrictions were expected and intended to give full force to the mandate of the opinion for this Court in *Mapp* v. *Ohio,* 367 U. S. 643. See 2 McKinney's Session Laws of New York 3677 (1962); New York State Legislative Annual 16 (1962). If it was then supposed that information obtained without a prior § 813–a order must, as a consequence of *Mapp,* be excluded from evidence, but that evidence obtained with a § 813–a order need not be excluded, it can only have been assumed that the requirements applicable to the issuance of § 813–a orders were entirely consistent with the demands of the Fourth and Fourteenth Amendments. The legislature recog-

nized the "hiatus" in its law created by *Mapp,* and wished to set its own "house . . . in order." New York State Legislative Annual, *supra,* at 18. It plainly understood that the Amendments were applicable, and intended to adhere fully to their requirements.

New York's permissive eavesdropping statute must, for purposes of assessing its constitutional validity on its face, be read "as though" this judicial gloss had been "written into" it. *Poulos* v. *New Hampshire, supra,* at 402. I can only conclude that, so read, the statute incorporates as limitations upon its employment the requirements of the Fourth Amendment.

### III.

The Court has frequently observed that the Fourth Amendment's two clauses impose separate, although related, limitations upon searches and seizures; the first "is general and forbids every search that is unreasonable," *Go-Bart Co.* v. *United States,* 282 U. S. 344, 357; the second places a number of specific constraints upon the issuance and character of warrants. It would be inappropriate and fruitless to undertake now to set the perimeters of "reasonableness" with respect to eavesdropping orders in general; any limitations, for example, necessary upon the period over which eavesdropping may be conducted, or upon the use of intercepted information unconnected with the offenses for which the eavesdropping order was first issued, should properly be developed only through a case-by-case examination of the pertinent questions. It suffices here to emphasize that, in my view, electronic eavesdropping, *as such* or as it is permitted by this statute, is not an unreasonable search and seizure.

At the least, reasonableness surely implies that this Court must not constrain in any grudging fashion the development of procedures, consistent with the Amendment's essential purposes, by which methods of search and seizure unknown in 1789 may be appropriately con-

trolled. It is instead obliged to permit, and indeed even to encourage, serious efforts to approach constructively the difficult problems created by electronic eavesdropping. In this situation, the Court should recognize and give weight to the State's careful efforts to restrict the excessive or unauthorized employment of these devices. New York has provided that no use may be made of eavesdropping devices without a prior court order, and that such an order is obtainable only upon the application of state prosecutorial authorities or of policemen of suitable seniority. N. Y. Code Crim. Proc. § 813–a. Eavesdropping conducted without an order is punishable by imprisonment for as much as two years. N. Y. Pen. Law §§ 738, 740. Information obtained through impermissible eavesdropping may not be employed for any purpose in any civil or criminal action, proceeding, or hearing, except in the criminal prosecution of the unauthorized eavesdropper himself. N. Y. Civ. Prac. § 4506. These restrictions are calculated to prevent the "unbridled,"[1] "unauthorized,"[2] and "indiscriminate"[3] electronic searches and seizures which members of this Court have frequently condemned. Surely the State's efforts warrant at least a careful, and even sympathetic, examination of the fashion in which the state courts have construed these provisions, and in which they have applied them to the situation before us. I cannot, in any event, agree that the Fourth Amendment can properly be taken as a roadblock to the use, within appropriate limits, of law enforcement techniques necessary to keep abreast of modern-day criminal activity. The importance of these devices as a tool of effective law enforcement is impressively attested by the data marshalled in my Brother WHITE's dissenting opinion. *Post,* p. 107.

---

[1] *Hoffa* v. *United States,* 385 U. S. 293, 317 (dissenting opinion).

[2] *Silverman* v. *United States,* 365 U. S. 505, 510.

[3] *Lopez* v. *United States,* 373 U. S. 427, 441 (opinion concurring in result).

## IV.

I turn to what properly is the central issue in this case: the validity under the Warrants Clause of the Fourth Amendment of the eavesdropping order under which the recordings employed at petitioner's trial were obtained. It is essential first to set out certain of the pertinent facts.

The disputed recordings were made under the authority of a § 813–a order, dated June 12, 1962, permitting the installation of an eavesdropping device in the business office of one Harry Steinman; the order, in turn, was, so far as this record shows, issued solely upon the basis of information contained in affidavits submitted to the issuing judge by two assistant district attorneys. The first affidavit, signed by Assistant District Attorney Goldstein, indicated that the Rackets Bureau of the District Attorney's Office of New York County was then conducting an investigation of alleged corruption in the State Liquor Authority, and that the Bureau had received information that persons desiring to obtain or retain liquor licenses were obliged to pay large sums to officials of the Authority. It described the methods by which the bribe money was transmitted through certain attorneys to the officials. The affidavit asserted that one Harry Neyer, a former employee of the Authority, served as a "conduit." It indicated that evidence had been obtained "over a duly authorized eavesdropping device installed in the office of the aforesaid Harry Neyer," that conferences "relative to the payment of unlawful fees" occurred in Steinman's office. The number and street address of the office were provided. The affidavit specified that the "evidence indicates that the said Harry Steinman has agreed to pay, through the aforesaid Harry Neyer, $30,000" in order to secure a license for the Palladium Ballroom, an establishment

within New York City. The Palladium, it was noted, had been the subject of hearings before the Authority "because of narcotic arrests therein." On the basis of this information, the affidavit sought an order to install a recording device in Steinman's business office.

The second affidavit, signed by Assistant District Attorney Scotti, averred that Scotti, as the Chief of the Bureau to which Goldstein was assigned, had read Goldstein's affidavit, and had concluded that the order might properly issue under § 813-a.

The order as issued permitted the recording of "any and all conversations, communications and discussions" in Steinman's business office for a period of 60 days.

The central objections mounted to this order by petitioner, and repeated as to the statute itself by the Court, are three: first, that it fails to specify with adequate particularity the conversations to be seized; second, that it permits a general and indiscriminate search and seizure; and third, that the order was issued without a showing of probable cause.[4]

Each of the first two objections depends principally upon a problem of definition: the meaning in this context of the constitutional distinction between "search" and "seizure." If listening alone completes a "seizure," it would be virtually impossible for state authorities at a probable cause hearing to describe with particularity the seizures which would later be made during extended eavesdropping; correspondingly, seizures would unavoidably be made which lacked any sufficient nexus with the

---

[4] Two of petitioner's other contentions are plainly foreclosed by recent opinions of this Court. His contention that eavesdropping unavoidably infringes the rule forbidding the seizure of "mere evidence" is precluded by *Warden* v. *Hayden*, 387 U. S. 294. His contention that eavesdropping violates his constitutional privilege against self-incrimination is answered by *Osborn* v. *United States*, 385 U. S. 323, and *Hoffa* v. *United States*, 385 U. S. 293.

offenses for which the order was first issued. Cf. *Kremen v. United States,* 353 U. S. 346; *Warden* v. *Hayden,* 387 U. S. 294. There is no need for present purposes to explore at length the question's subtleties; it suffices to indicate that, in my view, conversations are not "seized" either by eavesdropping alone, or by their recording so that they may later be heard at the eavesdropper's convenience. Just as some exercise of dominion, beyond mere perception, is necessary for the seizure of tangibles, so some use of the conversation beyond the initial listening process is required for the seizure of the spoken word. Cf. *Lopez* v. *United States,* 373 U. S. 427, 459 (dissenting opinion); *United States* v. *On Lee,* 193 F. 2d 306, 313–314 (dissenting opinion); *District of Columbia* v. *Little,* 85 U. S. App. D. C. 242, 247, 178 F. 2d 13, 18, affirmed on other grounds, 339 U. S. 1. With this premise, I turn to these three objections.

The "particularity" demanded by the Fourth Amendment has never been thought by this Court to be reducible "to formula"; *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 209; it has instead been made plain that its measurement must take fully into account the character both of the materials to be seized and of the purposes of the seizures. Accordingly, where the materials "are books, and the basis for their seizure is the ideas which they contain," the most "scrupulous exactitude" is demanded in the warrant's description; *Stanford* v. *Texas,* 379 U. S. 476, 485; see also *Marcus* v. *Search Warrant,* 367 U. S. 717; but where the special problems associated with the First Amendment are not involved, as they are not here, a more "reasonable particularity," *Brown* v. *United States,* 276 U. S. 134, 143; *Consolidated Rendering Co.* v. *Vermont,* 207 U. S. 541, 554, is permissible. The degree of particularity necessary is best measured by that requirement's purposes. The central purpose of the particularity requirement is to leave "nothing . . . to the discretion of the officer exe-

cuting the warrant," *Marron* v. *United States,* 275 U. S. 192, 196, by describing the materials to be seized with precision sufficient to prevent "the seizure of one thing under a warrant describing another." *Ibid.* The state authorities are not compelled at the probable cause hearing to wager, upon penalty of a subsequent reversal, that they can successfully predict each of the characteristics of the materials which they will later seize, cf. *Consolidated Rendering Co.* v. *Vermont, supra,* at 554; such a demand would, by discouraging the use of the judicial process, defeat the Amendment's central purpose. *United States* v. *Ventresca,* 380 U. S. 102, 108.

The materials to be seized are instead described with sufficient particularity if the warrant readily permits their identification both by those entrusted with the warrant's execution and by the court in any subsequent judicial proceeding. "It is," the Court has said with reference to the particularity of the place to be searched, "enough if the description is such that the officer . . . can with reasonable effort ascertain and identify" the warrant's objects. *Steele* v. *United States No. 1,* 267 U. S. 498, 503.

These standards must be equally applicable to the seizure of words, and, under them, this order did not lack the requisite particularity. The order here permitted the interception, or search, of any and all conversations occurring within the order's time limitations at the specified location; but this direction must be read in light of the terms of the affidavits, which, under § 813, form part of the authority for the eavesdropping. The affidavits make plain that, among the intercepted conversations, the police were authorized to seize only those "relative to the payment of unlawful fees necessary to obtain liquor licenses." These directions sufficed to provide a standard which left nothing in the choice of materials to be seized to the "whim," *Stanford* v. *Texas, supra,* at 485, of the state authorities. There could be no difficulty,

either in the course of the search or in any subsequent judicial proceeding, in determining whether specific conversations were among those authorized for seizure by the order. The Fourth and Fourteenth Amendments do not demand more. Compare Kamisar, The Wiretapping-Eavesdropping Problem: A Professor's View, 44 Minn. L. Rev. 891, 913.

Nor was the order invalid because it permitted the search of any and all conversations occurring at the specified location; if the requisite papers have identified the materials to be seized with sufficient particularity, as they did here, and if the search was confined to an appropriate area, the order is not invalidated by the examination of all within that area reasonably necessary for discovery of the materials to be seized. I do not doubt that searches by eavesdrop must be confined in time precisely as the search for tangibles is confined in space, but the actual duration of the intrusion here, or for that matter the total period authorized by the order, was not, given the character of the offenses involved, excessive. All the disputed evidence was obtained within 13 days, scarcely unreasonable in light of an alleged conspiracy involving many individuals and a lengthy series of transactions.

The question therefore remains only whether, as petitioner suggests, the order was issued without an adequate showing of probable cause. The standards for the measurement of probable cause have often been explicated in the opinions of this Court; see, e. g., United States v. Ventresca, 380 U. S. 102; its suffices now simply to emphasize that the information presented to the magistrate or commissioner must permit him to "judge for himself the persuasiveness of the facts relied on by a complaining officer." Giordenello v. United States, 357 U. S. 480, 486. The magistrate must "assess independently the probability" that the facts are as the

complainant has alleged; *id.,* at 487; he may not "accept without question the complainant's mere conclusion." *Id.,* at 486.

As measured by the terms of the affidavits here, the issuing judge could properly have concluded that probable cause existed for the order. Unlike the situations in *Nathanson* v. *United States,* 290 U. S. 41, and *Giordenello* v. *United States, supra,* the judge was provided the evidence which supported the affiants' conclusions; he was not compelled to rely merely on their "affirmation of suspicion and belief," *Nathanson* v. *United States, supra,* at 46. Compare *Rugendorf* v. *United States,* 376 U. S. 528; *Aguilar* v. *Texas,* 378 U. S. 108. In my opinion, taking the Steinman affidavits on their face, the constitutional requirements of probable cause were fully satisfied.

## V.

It is, however, plain that the Steinman order was issued principally upon the basis of evidence obtained under the authority of the Neyer order; absent the Neyer eavesdropped evidence, the Steinman affidavits consist entirely of conclusory assertions, and they would, in my judgment, be insufficient. It is, therefore, also necessary to examine the Neyer order.

The threshold issue is whether petitioner has standing to challenge the validity under the Constitution of the Neyer order. Standing to challenge the constitutional validity of a search and seizure has been an issue of some difficulty and uncertainty;[5] it has, nevertheless, hitherto been thought to hinge, not upon the use against the challenging party of evidence seized during the

[5] See, *e. g.,* Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw. U. L. Rev. 471; Comment, Standing to Object to an Unreasonable Search and Seizure, 34 U. Chi. L. Rev. 342; Recent Development, Search and Seizure: Admissibility of Illegally Acquired Evidence Against Third Parties, 66 Col. L. Rev. 400.

search, but instead upon whether the privacy of the challenging party's premises or person has been invaded. *Jones* v. *United States,* 362 U. S. 257; *Wong Sun* v. *United States,* 371 U. S. 471. These cases centered upon searches conducted by federal authorities and challenged under Fed. Rule Crim. Proc. 41 (e), but there is no reason now to suppose that any different standard is required by the Fourteenth Amendment for searches conducted by state officials. See generally Maguire, Evidence of Guilt 215–216 (1959).

The record before us does not indicate with precision what information was obtained under the Neyer order, but it appears, and petitioner does not otherwise assert, that petitioner was never present in Neyer's office during the period in which eavesdropping was conducted. There is, moreover, no suggestion that petitioner had any property interest in the premises in which the eavesdropping device was installed. Apart from the use of evidence obtained under the Neyer order to justify issuance of the Steinman order, under which petitioner's privacy was assuredly invaded, petitioner is linked with activities under the Neyer order only by one fleeting and ambiguous reference in the record.

In a pretrial hearing conducted on a motion to suppress the Steinman recordings, counsel for the State briefly described the materials obtained under the Neyer order. Counsel indicated that

> "Mr. Neyer then has conversations with Mr. Steinman and other persons. In the course of some of these conversations, we have one-half of a telephone call, of several telephone calls between Mr. Neyer and a person he refers to on the telephone as Mr. Berger; and in the conversation with Mr. Berger Mr. Neyer discusses also the obtaining of a liquor license for the Palladium and mentions the fact that this is going to be a big one."

Counsel for petitioner responded, shortly after, that "I take it . . . that none of the subject matter to which [counsel for the State] has just adverted is any part of this case . . . ." Counsel for the State responded:

> "That's right, your Honor. I am not—I think evidence can be brought out during the trial that Berger, who Mr. Steinman, Mr. Neyer speaks to concerning the Palladium, is, in fact, the defendant Ralph Berger."

However oblique this invasion of petitioner's personal privacy might at first seem, it would entirely suffice, in my view, to afford petitioner standing to challenge the validity of the Neyer order. It is surely without significance in these circumstances that petitioner did not conduct the conversation from a position physically within the room in which the device was placed; the fortuitousness of his location can matter no more than if he had been present for a conference in Neyer's office, but had not spoken, or had been seated beyond the limits of the device's hearing. The central question should properly be whether his privacy has been violated by the search; it is enough for this purpose that he participated in a discussion into which the recording intruded. Standing should not, in any event, be made an insuperable barrier which unnecessarily deprives of an adequate remedy those whose rights have been abridged; to impose distinctions of excessive refinement upon the doctrine "would not comport with our justly proud claim of the procedural protections accorded to those charged with crime." *Jones* v. *United States, supra,* at 267. It would instead "permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right." *United States* v. *Jeffers,* 342 U. S. 48, 52. I would conclude that, under the circumstances here, the recording of a portion of a telephone conversation to which peti-

tioner was party would suffice to give him standing to challenge the validity under the Constitution of the Neyer order.[6]

Given petitioner's standing under federal law to challenge the validity of the Neyer order, I would conclude that such order was issued without an adequate showing of probable cause. It seems quite plain, from the facts described by the State, that at the moment the Neyer order was sought the Rackets Bureau indeed had ample information to justify the issuance of an eavesdropping order. Nonetheless, the affidavits presented at the Neyer hearing unaccountably contained only the most conclusory allegations of suspicion. The record before us is silent on whether additional information might have been orally presented to the issuing judge.[7] Under these circumstances, I am impelled to the view that the judge lacked sufficient information to permit him to assess the circumstances as a "neutral and detached magistrate," *Johnson* v. *United States,* 333 U. S. 10, 14, and accordingly that the Neyer order was impermissible.

## VI.

It does not follow, however, that evidence obtained under the Neyer order could not properly have been

---

[6] While on this record it cannot be said with entire assurance that the "Berger" mentioned in the Neyer eavesdropped conversation was this petitioner, I think it proper to proceed at this juncture on the basis that such is the case, leaving whatever questions of identity there may be to such state proceedings as, on the premises of this opinion, might subsequently eventuate in the state courts. See n. 8, *infra.*

[7] The only additional reference in the record possibly pertinent to the content of the Neyer hearing is a conclusory assertion by counsel for the State in argument on the motion to suppress that the State had shown its evidence to the issuing judge. The reference is obscure, but its context suggests strongly that counsel meant only that the Steinman affidavits were adequate for purposes of probable cause.

employed to support issuance of the Steinman order. The basic question here is the scope of the exclusionary rule fashioned in *Weeks* v. *United States,* 232 U. S. 383, and made applicable to state proceedings in *Mapp* v. *Ohio,* 367 U. S. 643. The Court determined in *Weeks* that the purposes of the Fourth Amendment could be fully vindicated only if materials seized in violation of its requirements were excluded from subsequent use against parties aggrieved by the seizure. Despite broader statements in certain of the cases, see, *e. g., Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392, the situations for which the *Weeks* rule was devised, and to which it has since been applied, have uniformly involved misconduct by police or prosecutorial authorities. The rule's purposes have thus been said to be both to discourage "disobedience to the Federal Constitution," *Mapp* v. *Ohio, supra,* at 657, and to avoid any possibility that the courts themselves might be "accomplices in the willful disobedience of a Constitution they are sworn to uphold." *Elkins* v. *United States,* 364 U. S. 206, 223. The Court has cautioned that the exclusionary rule was not intended to establish supervisory jurisdiction over the administration of state criminal justice, and that the States might still fashion "workable rules governing arrests, searches and seizures." *Ker* v. *California,* 374 U. S. 23, 34.

I find nothing in the terms or purposes of the rule which demands the invalidation, under the circumstances at issue here, of the Steinman order. The state authorities appeared, as the statute requires, before a judicial official, and held themselves ready to provide information to justify the issuance of an eavesdropping order. The necessary evidence was at hand, and there was apparently no reason for the State to have preferred that it not be given to the issuing judge. The Neyer order is thus invalid simply as a consequence of the

judge's willingness to act upon substantially less information than the Fourteenth Amendment obliged him to demand; correspondingly, the only "misconduct" that could be charged against the prosecution consists entirely of its failure to press additional evidence upon him. If the exclusionary rule were to be applied in this and similar situations, praiseworthy efforts of law enforcement authorities would be seriously, and quite unnecessarily, hampered; the evidence lawfully obtained under a lengthy series of valid warrants might, for example, be lost by the haste of a single magistrate. The rule applied in that manner would not encourage police officers to adhere to the requirements of the Constitution; it would simply deprive the State of evidence it has sought in accordance with those requirements.

I would hold that where, as here, authorities have obtained a warrant in a judicial proceeding untainted by fraud, a second warrant issued on the authority of evidence gathered under the first is not invalidated by a subsequent finding that the first was issued without a showing of probable cause.

## VII.

It follows that the Steinman order was, as a matter of constitutional requirement, validly issued, that the recordings obtained under it were properly admitted at petitioner's trial, and, accordingly, that his conviction must be affirmed.[8]

---

[8] Whether N. Y. Civ. Prac. § 4506, as amended to take effect July 1, 1962, some 18 days after the issuance of the Steinman order, would be deemed, under the premises of this opinion, to render inadmissible at Berger's trial the evidence procured under it, is a matter for the state courts to decide. See *People* v. *Cohen,* 42 Misc. 2d 403, 408, 409, 248 N. Y. S. 2d 339, 344, 345; *People* v. *Beshany,* 43 Misc. 2d 521, 532, 252 N. Y. S. 2d 110, 121. Further state proceedings on that score would of course not be foreclosed under a disposition in accordance with this opinion.

MR. JUSTICE WHITE, dissenting.

With all due respect, I dissent from the majority's decision which unjustifiably strikes down "on its face" a 1938 New York statute applied by state officials in securing petitioner's conviction. In addition, I find no violation of petitioner's constitutional rights and I would affirm.

I.

At petitioner's trial for conspiring to bribe the Chairman of the New York State Liquor Authority, the prosecution introduced tape recordings obtained through an eavesdrop of the office of Harry Steinman which had been authorized by court order pursuant to § 813–a, N. Y. Code Crim. Proc. Since Berger was rightfully in Steinman's office when his conversations were recorded through the Steinman eavesdrop, he is entitled to have those recordings excluded at his trial if they were unconstitutionally obtained. *Jones* v. *United States,* 362 U. S. 257; *Silverman* v. *United States,* 365 U. S. 505. Petitioner vigorously argues that all judicially authorized eavesdropping violates Fourth Amendment rights, but his position is unsound.

Two of petitioner's theories are easily answered. First, surreptitious electronic recording of conversations among private persons, and introduction of the recording during a criminal trial, do not violate the Fifth Amendment's ban against compulsory self-incrimination because the conversations are not the product of any official compulsion. *Olmstead* v. *United States,* 277 U. S. 438; *Hoffa* v. *United States,* 385 U. S. 293; *Osborn* v. *United States,* 385 U. S. 323. Second, our decision in *Warden* v. *Hayden,* 387 U. S. 294, answers petitioner's contention that eavesdropping under § 813–a constitutes an unlawful search for "mere evidence"; whatever the limits of the search and seizure power may be under the Fourth Amendment,

the oral evidence of a furtive bribery conspiracy sought in the application for the Steinman eavesdrop order was within the scope of proper police investigation into suspected criminal activity.

Petitioner primarily argues that eavesdropping is invalid, even pursuant to court order or search warrant, because it constitutes a "general search" barred by the Fourth Amendment. Petitioner suggests that the search is inherently overbroad because the eavesdropper will overhear conversations which do not relate to criminal activity. But the same is true of almost all searches of private property which the Fourth Amendment permits. In searching for seizable matters, the police must necessarily see or hear, and comprehend, items which do not relate to the purpose of the search. That this occurs, however, does not render the search invalid, so long as it is authorized by a suitable search warrant and so long as the police, in executing that warrant, limit themselves to searching for items which may constitutionally be seized.[1] Thus, while I would agree with petitioner that individual searches of private property through surreptitious eavesdropping with a warrant must be carefully circumscribed to avoid excessive invasion of privacy and security, I cannot agree that all such intrusions are constitutionally impermissible general searches.

This case boils down, therefore, to the question of whether § 813–a was constitutionally applied in this case. At the outset, it is essential to note that the recordings of the Neyer office eavesdrop were not introduced at petitioner's trial, nor was petitioner present during this electronic surveillance, nor were any of petitioner's words recorded by that eavesdrop. The only links between the

---

[1] Recording an innocent conversation is no more a "seizure" than occurs when the policeman personally overhears conversation while conducting a search with a warrant.

Neyer eavesdrop and petitioner's conviction are (a) that evidence secured from the Neyer recordings was used in the Steinman affidavits, which in turn led to the Steinman eavesdrop where petitioner's incriminating conversations were overheard; and (b) that the Neyer eavesdrop recorded what *may have been* [2] the Neyer end of a telephone conversation between Neyer and Berger. In my opinion, it is clear that neither of these circumstances is enough to establish that Berger's Fourth Amendment interests were invaded by the eavesdrop in Neyer's office. *Wong Sun* v. *United States,* 371 U. S. 471; *Jones* v. *United States,* 362 U. S. 257. Thus, petitioner cannot secure reversal on the basis of the allegedly unconstitutional Neyer eavesdrop.

I turn to the circumstances surrounding the issuance of the one eavesdrop order which petitioner has "standing" to challenge. On June 11, 1962, Assistant District Attorney David Goldstein filed an affidavit before Judge Joseph Sarafite of the New York County Court of General Sessions requesting a court order under § 813–a authorizing the Steinman eavesdrop. Goldstein averred that the District Attorney's office was investigating

---

[2] Petitioner has not included a transcript of the Neyer recording in the record before this Court. In an oral statement during the hearing on petitioner's motion to suppress eavesdrop evidence, the prosecutor stated:

"In the course of some of these conversations [recorded by the Neyer eavesdrop], we have one-half of a telephone call, of several telephone calls between Mr. Neyer and a person he refers to on the telephone as Mr. Berger; and in the conversation with Mr. Berger Mr. Neyer discusses also the obtaining of a liquor license for the Palladium and mentions the fact that this is going to be a big one." R., at 27.

Petitioner made no argument, and offered no evidence, at the suppression hearing that the alleged Neyer-Berger phone conversation provided the State with evidence that was used to secure the Steinman eavesdrop order.

alleged corruption in the State Liquor Authority, that the office had obtained evidence of a conspiracy between Authority officials and private attorneys to extort large illegal payments from liquor license applicants, that a "duly authorized eavesdropping device" had previously been installed in the office of Neyer who was suspected of acting as a conduit for the bribes, and that this device had obtained evidence "that conferences relative to the payment of unlawful fees necessary to obtain liquor licenses occur in the office of one Harry Steinman, located in Room 801 at 15 East 48th Street, in the County, City and State of New York." The affidavit went on to describe Steinman at length as a prospective liquor license applicant and to relate evidence of a specific payoff which Steinman was likely to make, through Neyer, in the immediate future. On the basis of these facts, the affidavit concluded that "there is reasonable ground to believe that evidence of crime may be obtained by overhearing and recording the conversations, communications and discussions that may take place in the office of Harry Steinman which is located in Room 801 at 15 East 48th Street," and requested an order authorizing an eavesdrop until August 11, 1962. An affidavit of Assistant District Attorney Alfred Scotti verified the information contained in the Goldstein affidavit. The record also indicates that the affidavits were supplemented by orally presenting to Judge Sarafite all of the evidence obtained from the Neyer eavesdrop. But assuming that the Steinman court order was issued on the affidavits alone, I am confident that those affidavits are sufficient under the Fourth Amendment.

Goldstein's affidavit described with "particularity" what crime Goldstein believed was being committed; it requested authority to search one specific room; it described the principal object of the search—Steinman and his co-conspirators—and the specific conversations

which the affiant hoped to seize; it gave a precise time limit to the search; and it told the judge the manner in which the affiant had acquired his information. Petitioner argues that the reliability of the Neyer eavesdrop information was not adequately verified in the Steinman affidavit. But the Neyer eavesdrop need not be explained in detail in an application to the very judge who had authorized it just two months previously. Judge Sarafite had every reason to conclude that the Neyer eavesdrop was a reliable basis for suspecting a criminal conspiracy (consisting as the recording did of admissions by Steinman and other co-conspirators) and that it was the source of the specific evidence recited in the Steinman affidavits. "[A]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion," *United States* v. *Ventresca,* 380 U. S. 102, 108. I conclude that the Steinman affidavits fully satisfied the Fourth Amendment requirements of probable cause and particularity in the issuance of search warrants.

The Court, however, seems irresistibly determined to strike down the New York statute. The majority criticizes the *ex parte* nature of § 813–a court orders, the lack of a requirement that "exigent circumstances" be shown, and the fact that one court order authorizes "a series or a continuous surveillance." But where are such search warrant requirements to be found in the Fourth Amendment or in any prior case construing it? The Court appears intent upon creating out of whole cloth new constitutionally mandated warrant procedures carefully tailored to make eavesdrop warrants unobtainable. That is not a judicial function. The question here is whether *this* search complied with Fourth Amendment standards. There is no indication in this record that the District Attorney's office seized and used conversa-

tions not described in the Goldstein affidavit, nor that officials continued the search after the time when they had gathered the evidence which they sought. Given the constitutional adequacy of the Goldstein affidavit in terms of Fourth Amendment requirements of probable cause and particularity, I conclude that both the search and seizure in Steinman's office satisfied Fourth Amendment mandates. Regardless of how the Court would like eavesdropping legislation to read, our function ends in a state case with the determination of these questions.

## II.

Unregulated use of electronic surveillance devices by law enforcement officials and by private parties poses a grave threat to the privacy and security of our citizens. As the majority recognizes, New York is one of a handful of States that have reacted to this threat by enacting legislation that limits official use of all such devices to situations where designated officers obtain judicial authorization to eavesdrop. Except in these States, there is a serious lack of comprehensive and sensible legislation in this field, a need that has been noted by many, including the President's prestigious Commission on Law Enforcement and Administration of Justice (the "Crime Commission") in its just-published reports.[3] Bills have been introduced at this session of Congress to fill this legislative gap, and extensive hearings are in progress before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, and before Subcommittee No. 5 of the House Committee on the Judiciary.

[3] The portion of the Crime Commission's report dealing with wiretapping and eavesdropping is reproduced in Appendix A to this opinion. A more detailed explanation of why most Commission members favored legislation permitting controlled use of electronic surveillance for law enforcement purposes can be found in the Commission's Task Force Report on Organized Crime, cited *infra*.

At least three positions have been presented at these hearings. Opponents of eavesdropping and wiretapping argue that they are so "odious" an invasion of privacy that they should never be tolerated. The Justice Department, in advocating the Administration's current position, asserts a more limited view; its bill would prohibit all wiretapping and eavesdropping by state and federal authorities except in cases involving the "national security," and in addition would ban judicial use of evidence gathered even in national security cases. S. 928 and H. R. 5386, 90th Cong., 1st Sess. Advocates of a third position, who include many New York law enforcement personnel and others, agree that official eavesdropping and wiretapping must be stringently controlled but argue that such methods are irreplaceable investigative tools which are needed for the enforcement of criminal laws and which can be adequately regulated through legislation such as New York's § 813–a.

The grant of certiorari in this case has been widely noted, and our decision can be expected to have a substantial impact on the current legislative consideration of these issues. Today's majority does not, in so many words, hold that all wiretapping and eavesdropping are constitutionally impermissible. But by transparent indirection it achieves practically the same result by striking down the New York statute and imposing a series of requirements for legalized electronic surveillance that will be almost impossible to satisfy.

In so doing, the Court ignores or discounts the need for wiretapping authority and incredibly suggests that there has been no breakdown of federal law enforcement despite the unavailability of a federal statute legalizing electronic surveillance. The Court thereby impliedly disagrees with the carefully documented reports of the Crime Commission which, contrary to the Court's intimations, underline the serious proportions of professional

criminal activity in this country, the failure of current national and state efforts to eliminate it, and the need for a statute permitting carefully controlled official use of electronic surveillance, particularly in dealing with organized crime and official corruption. See Appendix A, *infra;* Report of the Crime Commission's Task Force on Organized Crime 17–19, 80, 91–113 (1967). How the Court can feel itself so much better qualified than the Commission, which spent months on its study, to assess the needs of law enforcement is beyond my comprehension. We have only just decided that reasonableness of a search under the Fourth Amendment must be determined by weighing the invasions of Fourth Amendment interests which wiretapping and eavesdropping entail against the public need justifying such invasions. *Camara* v. *Municipal Court,* 387 U. S. 523; *See* v. *City of Seattle,* 387 U. S. 541. In these terms, it would seem imperative that the Court at least deal with facts of the real world. This the Court utterly fails to do. In my view, its opinion is wholly unresponsive to the test of reasonableness under the Fourth Amendment.

The Court also seeks support in the fact that the Federal Government does not now condone electronic eavesdropping. But here the Court is treading on treacherous ground.[4] It is true that the Department of Justice has now disowned the relevant findings and recommendations of the Crime Commission, see Hearings on H. R. 5386 before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., ser. 3, at 308 (1967) (hereafter cited as "House Hearings"),

---

[4] The Court should draw no support from the Solicitor General's confession of error in recent cases, for they involved surreptitious eavesdropping by federal officers without judicial authorization. Such searches are clearly invalid because they violate the Fourth Amendment's warrant requirements. *Silverman* v. *United States, supra.*

and that it has recommended to the Congress a bill which would impose broad prohibitions on wiretapping and eavesdropping. But although the Department's communication to the Congress speaks of "exercis[ing] the full reach of our constitutional powers to outlaw electronic eavesdropping on private conversations," [5] the fact is, as I have already indicated, that the bill does nothing of the kind. Both H. R. 5386 and its counterpart in the Senate, S. 928, provide that the prohibitions in the bill shall not be deemed to apply to interceptions in national security cases. Apparently, under this legislation, the President without court order would be permitted to authorize wiretapping or eavesdropping "to protect the Nation against actual or potential attack or other hostile acts of a foreign power or any other serious threat to the security of the United States, or to protect national security information against foreign intelligence activities." H. R. 5386 and S. 928, § 3.

There are several interesting aspects to this proposed national security exemption in light of the Court's opinion. First, there is no limitation on the President's power to delegate his authority, and it seems likely that at least the Attorney General would exercise it. House Hearings, at 302. Second, the national security exception would reach cases like sabotage and investigations of organizations controlled by a foreign government. For example, wiretapping to prove an individual is a member of the Communist Party, it is said, would be permissible under the statute. House Hearings, at 292. Third, information from authorized surveillance in the national security area would not be admissible in evidence; to the contrary, the surveillance would apparently be for investigative and informational use only, not for

---

[5] Letter from the Acting Attorney General to the Speaker of the House of Representatives submitting the Administration's "Right of Privacy Act of 1967" (H. R. 5386), Feb. 8, 1967.

use in a criminal prosecution and not authorized because of any belief or suspicion that a crime is being committed or is about to be committed. House Hearings, at 289. Fourth, the Department of Justice has recommended that the Congress not await this Court's decision in the case now before us because whether or not the Court upholds the New York statute the power of Congress to enact the proposed legislation would not be affected. House Hearings, at 308. But if electronic surveillance is a "general search," or if it must be circumscribed in the manner the Court now suggests, how can surreptitious electronic surveillance of a suspected Communist or a suspected saboteur escape the strictures of the Fourth Amendment? It seems obvious from the Department of Justice bill that the present Administration believes that there are some purposes and uses of electronic surveillance which do not involve violations of the Fourth Amendment by the Executive Branch. Such being the case, even if the views of the Executive were to be the final answer in this case, the requirements imposed by the Court to constitutionalize wiretapping and eavesdropping are a far cry from the practice anticipated under the proposed federal legislation now before the Congress.

But I do not think the views of the Executive should be dispositive of the broader Fourth Amendment issues raised in this case. If the security of the National Government is a sufficient interest to render eavesdropping reasonable, on what tenable basis can a contrary conclusion be reached when a State asserts a purpose to prevent the corruption of its major officials, to protect the integrity of its fundamental processes, and to maintain itself as a viable institution? The serious threat which organized crime poses to our society has been frequently documented. The interrelation between organized crime

and corruption of governmental officials is likewise well established,[6] and the enormous difficulty of eradicating both forms of social cancer is proved by the persistence of the problems if by nothing else. The Crime Commission has concluded that "only in New York have law enforcement officials been able to mount a relatively continuous and relatively successful attack on an organized crime problem," that "electronic surveillance techniques . . . have been *the* tools" making possible such an attack, and that practice under New York's § 813–a has achieved a proper balance between the interests of "privacy and justice." Task Force Report, at 95. And New York County District Attorney Frank S. Hogan, who has been on the job almost as long as any member of this Court, has said of the need for legislation similar to § 813–a:

> "The judicially supervised system under which we operate has worked. It has served efficiently to protect the rights, liberties, property, and general welfare of the law-abiding members of our community. It has permitted us to undertake major investigations of organized crime. Without it, and I confine myself to top figures in the underworld, my own office could not have convicted Charles 'Lucky' Luciano, Jimmy Hines, Louis 'Lepke' Buchalter, Jacob 'Gurrah' Shapiro, Joseph 'Socks' Lanza, George Scalise, Frank Erickson, John 'Dio' Dioguardi, and Frank Carbo. Joseph 'Adonis' Doto,

---

[6] "All available data indicate that organized crime flourishes only where it has corrupted local officials. As the scope and variety of organized crime's activities have expanded, its need to involve public officials at every level of local government has grown. And as government regulation expands into more and more areas of private and business activity, the power to corrupt likewise affords the corrupter more control over matters affecting the everyday life of each citizen." Task Force Report, at 6.

who was tried in New Jersey, was convicted and deported on evidence supplied by our office and obtained by assiduously following leads secured through wiretapping." Hearings on S. 2813 before the Senate Committee on the Judiciary, 87th Cong., 2d Sess., at 173 (1962).

To rebut such evidence of the reasonableness of regulated use of official eavesdropping, the Court presents only outdated statistics on the use of § 813–a in the organized crime and corruption arenas, the failure of the Congress thus far to enact similar legislation for federal law enforcement officials, and the blind hope that other "techniques and practices may well be developed that will operate just as speedily and certainly." None of this is even remotely responsive to the question whether the use of eavesdropping techniques to unveil the debilitating corruption involved in this case was reasonable under the Fourth Amendment. At best, the Court puts forth an apologetic and grossly inadequate justification for frustrating New York law enforcement by invalidating § 813–a.

In any event, I do not consider this case a proper vehicle for resolving all of these broad constitutional and legislative issues raised by the problem of official use of wiretapping and eavesdropping. I would hold only that electronic surveillance was a reasonable investigative tool to apply in uncovering corruption among high state officials, compare *Osborn* v. *United States*, 385 U. S. 323, that the § 813–a court procedure as used in this case satisfied the Fourth Amendment's search warrant requirements, and that New York officials limited themselves to a constitutionally permissible search and seizure of petitioner's private conversations in executing that court order. Therefore, I would affirm.

APPENDIX TO OPINION OF MR. JUSTICE WHITE.

Excerpt from "The Challenge of Crime in a Free Society," A Report by the President's Commission on Law Enforcement and Administration of Justice, at 200–203 (1967).

## A NATIONAL STRATEGY AGAINST ORGANIZED CRIME

Law enforcement's way of fighting organized crime has been primitive compared to organized crime's way of operating. Law enforcement must use methods at least as efficient as organized crime's. The public and law enforcement must make a full-scale commitment to destroy the power of organized crime groups. The Commission's program indicates ways to implement that commitment.

### PROOF OF CRIMINAL VIOLATION

The previous section has described the difficulties that law enforcement agencies meet in trying to prove the participation of organized crime family members in criminal acts. Although earlier studies indicated a need for new substantive criminal laws, the Commission believes that on the Federal level, and in most State jurisdictions where organized crime exists, the major problem relates to matters of proof rather than inadequacy of substantive criminal laws, as the latter—for the most part—are reasonably adequate to deal with organized crime activity. The laws of conspiracy have provided an effective substantive tool with which to confront the criminal groups. From a legal standpoint, organized crime continues to grow because of defects in the evidence-gathering process. Under present procedures, too few witnesses have been produced to prove the link between criminal group members and the illicit activities that they sponsor.

*Grand Juries.* A compulsory process is necessary to obtain essential testimony or material. This is most readily accomplished by an investigative grand jury or an alternate mechanism through which the attendance of witnesses and production of books and records can be ordered. Such grand juries must stay in session long enough to allow for the unusually long time required to build an organized crime case. The possibility of arbitrary termination of a grand jury by supervisory judges constitutes a danger to successful completion of an investigation.

### *The Commission recommends:*

At least one investigative grand jury should be impaneled annually in each jurisdiction that has major organized crime activity.

If a grand jury shows the court that its business is unfinished at the end of a normal term, the court should extend that term a reasonable time in order to allow the grand jury to complete pending investigations. Judicial dismissal of grand juries with unfinished business should be appealable by the prosecutor and provision made for suspension of such dismissal orders during the appeal.

The automatic convening of these grand juries would force less than diligent investigators and prosecutors to explain their inaction. The grand jury should also have recourse when not satisfied with such explanations.

### *The Commission recommends:*

The grand jury should have the statutory right of appeal to an appropriate executive official, such as an attorney general or governor, to replace local prosecutors or investigators with special counsel or special investigators appointed only in relation to matters that they or the grand jury deem appropriate for investigation.

When a grand jury terminates, it should be permitted by law to file public reports regarding organized crime conditions in the community.

*Immunity.* A general immunity statute as proposed in chapter 5 on the courts is essential in organized crime investigations and prosecutions. There is evidence to indicate that the availability of immunity can overcome the wall of silence that so often defeats the efforts of law enforcement to obtain live witnesses in organized crime cases. Since the activities of criminal groups involve such a broad scope of criminal violations, immunity provisions covering this breadth of illicit actions are necessary to secure the testimony of uncooperative or criminally involved witnesses. Once granted immunity from prosecution based upon their testimony, such witnesses must testify before the grand jury and at trial, or face jail for contempt of court.

Federal, State, and local coordination of immunity grants, and approval by the jurisdiction's chief law enforcement officer before immunity is granted, are crucial in organized crime investigations. Otherwise, without such coordination and approval, or through corruption of officials, one jurisdiction might grant immunity to someone about to be arrested or indicted in another jurisdiction.

*The Commission recommends:*

A general witness immunity statute should be enacted at Federal and State levels, providing immunity sufficiently broad to assure compulsion of testimony. Immunity should be granted only with the prior approval of the jurisdiction's chief prosecuting officer. Efforts to coordinate Federal, State, and local immunity grants should be made to prevent interference with existing investigations.

*Perjury.* Many prosecutors believe that the incidence of perjury is higher in organized crime cases than in routine criminal matters. Immunity can be an effective prosecutive weapon only if the immunized witness then testifies truthfully. The present special proof requirements in perjury cases, detailed in chapter 5, inhibit prosecutors from seeking perjury indictments and lead to much lower conviction rates for perjury than for other crimes. Lessening of rigid proof requirements in perjury prosecutions would strengthen the deterrent value of perjury laws and present a greater incentive for truthful testimony.

*The Commission recommends:*

Congress and the States should abolish the rigid two-witness and direct-evidence rules in perjury prosecutions, but retain the requirement of proving an intentional false statement.

WIRETAPPING AND EAVESDROPPING

In connection with the problems of securing evidence against organized crime, the Commission considered issues relating to electronic surveillance, including wiretapping and "bugging"—the secret installation of mechanical devices at specific locations to receive and transmit conversations.

*Significance to Law Enforcement.* The great majority of law enforcement officials believe that the evidence necessary to bring criminal sanctions to bear consistently on the higher echelons of organized crime will not be obtained without the aid of electronic surveillance techniques. They maintain these techniques are indispensable to develop adequate strategic intelligence concerning organized crime, to set up specific investigations, to develop witnesses, to corroborate their testimony, and to serve as substitutes for them—each a necessary step in

the evidence-gathering process in organized crime investigations and prosecutions.

As previously noted, the organizational structure and operational methods employed by organized crime have created unique problems for law enforcement. High-ranking organized crime figures are protected by layers of insulation from direct participation in criminal acts, and a rigid code of discipline inhibits the development of informants against them. A soldier in a family can complete his entire crime career without ever associating directly with his boss. Thus, he is unable, even if willing, to link the boss directly to any criminal activity in which he may have engaged for their mutual benefit. Agents and employees of an organized crime family, even when granted immunity from prosecution, cannot implicate the highest level figures, since frequently they have neither spoken to, nor even seen them.

Members of the underworld, who have legitimate reason to fear that their meetings might be bugged or their telephones tapped, have continued to meet and to make relatively free use of the telephone—for communication is essential to the operation of any business enterprise. In legitimate business this is accomplished with written and oral exchanges. In organized crime enterprises, however, the possibility of loss or seizure of an incriminating document demands a minimum of written communication. Because of the varied character of organized criminal enterprises, the large numbers of persons employed in them, and frequently the distances separating elements of the organization, the telephone remains an essential vehicle for communication. While discussions of business matters are held on a face-to-face basis whenever possible, they are never conducted in the presence of strangers. Thus, the content of these conversations, including the planning of new illegal activity, and transmission of policy decisions or operating instruc-

tions for existing enterprises, cannot be detected. The extreme scrutiny to which potential members are subjected and the necessity for them to engage in criminal activity have precluded law enforcement infiltration of organized crime groups.

District Attorney Frank S. Hogan, whose New York County office has been acknowledged for over 27 years as one of the country's most outstanding, has testified that electronic surveillance is:

*the single most valuable weapon in law enforcement's fight against organized crime . . . It has permitted us to undertake major investigations of organized crime. Without it, and I confine myself to top figures in the underworld, my own office could not have convicted Charles "Lucky" Luciano, Jimmy Hines, Louis "Lepke" Buchalter, Jacob "Gurrah" Shapiro, Joseph "Socks" Lanza, George Scalise, Frank Erickson, John "Dio" Dioguardi, and Frank Carbo . . .*

Over the years New York has faced one of the Nation's most aggravated organized crime problems. Only in New York have law enforcement officials achieved some level of continuous success in bringing prosecutions against organized crime. For over 20 years, New York has authorized wiretapping on court order. Since 1957, bugging has been similarly authorized. Wiretapping was the mainstay of the New York attack against organized crime until Federal court decisions intervened. Recently chief reliance in some offices has been placed on bugging, where the information is to be used in court. Law enforcement officials believe that the successes achieved in some parts of the State are attributable primarily to a combination of dedicated and competent personnel and adequate legal tools; and that the failure to do more in New York has resulted primarily from the failure to commit additional resources of time and men. The

debilitating effect of corruption, political influence, and incompetence, underscored by the New York State Commission of Investigation, must also be noted.

In New York at one time, Court supervision of law enforcement's use of electronic surveillance was sometimes perfunctory, but the picture has changed substantially under the impact of pretrial adversary hearings on motions to suppress electronically seized evidence. Fifteen years ago there was evidence of abuse by low-rank policemen. Legislative and administrative controls, however, have apparently been successful in curtailing its incidence.

*The Threat to Privacy.* In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas. When dissent from the popular view is discouraged, intellectual controversy is smothered, the process for testing new concepts and ideas is hindered and desirable change is slowed. External restraints, of which electronic surveillance is but one possibility, are thus repugnant to citizens of such a society.

Today, in addition to some law enforcement agents, numerous private persons are utilizing these techniques. They are employed to acquire evidence for domestic relations cases, to carry on industrial espionage and counter-espionage, to assist in preparing for civil litigation, and for personnel investigations, among others. Technological advances have produced remarkably sophisticated devices, of which the electronic cocktail olive is illustrative, and continuing price reductions have expanded their markets. Nor has man's ingenuity in the development of surveillance equipment been exhausted with the design

and manufacture of electronic devices for wiretapping or for eavesdropping within buildings or vehicles. Parabolic microphones that pick up conversations held in the open at distances of hundreds of feet are available commercially, and some progress has been made toward utilizing the laser beam to pick up conversations within a room by focusing upon the glass of a convenient window. Progress in microminiaturizing electronic components has resulted in the production of equipment of extremely small size. Because it can detect what is said anywhere—not just on the telephone—bugging presents especially serious threats to privacy.

Detection of surveillance devices is difficult, particularly where an installation is accomplished by a skilled agent. Isolated instances where equipment is discovered in operation therefore do not adequately reflect the volume of such activity; the effectiveness of electronic surveillance depends in part upon investigators who do not discuss their activities. The current confusion over the legality of electronic surveillance compounds the assessment problem since many agents feel their conduct may be held unlawful and are unwilling to report their activities. It is presently impossible to estimate with any accuracy the volume of electronic surveillance conducted today. The Commission is impressed, however, with the opinions of knowledgeable persons that the incidence of electronic surveillance is already substantial and increasing at a rapid rate.

*Present Law and Practice.* In 1928 the U. S. Supreme Court decided that evidence obtained by wiretapping a defendant's telephone at a point outside the defendant's premises was admissible in a Federal criminal prosecution. The Court found no unconstitutional search and seizure under the Fourth Amendment. Enactment of Section 605 of the Federal Communications Act in 1934

precluded interception and disclosure of wire communications. The Department of Justice has interpreted this section to permit interception so long as no disclosure of the content outside the Department is made. Thus, wiretapping may presently be conducted by a Federal agent, but the results may not be used in court. When police officers wiretap and disclose the information obtained, in accordance with State procedure, they are in violation of Federal law.

Law enforcement experience with bugging has been much more recent and more limited than the use of the traditional wiretap. The legal situation with respect to bugging is also different. The regulation of the national telephone communication network falls within recognized national powers, while legislation attempting to authorize the placing of electronic equipment even under a warrant system would break new and uncharted ground. At the present time there is no Federal legislation explicitly dealing with bugging. Since the decision of the Supreme Court in *Silverman* v. *United States,* 365 U. S. 505 (1961), use of bugging equipment that involves an unauthorized physical entry into a constitutionally protected private area violates the Fourth Amendment, and evidence thus obtained is inadmissible. If eavesdropping is unaccompanied by such a trespass, or if the communication is recorded with the consent of one of the parties, no such prohibition applies.

The confusion that has arisen inhibits cooperation between State and Federal law enforcement agencies because of the fear that information secured in one investigation will legally pollute another. For example, in New York City prosecutors refuse to divulge the contents of wire communications intercepted pursuant to State court orders because of the Federal proscription but do utilize evidence obtained by bugging pursuant

128

to court order. In other sections of New York State, however, prosecutors continue to introduce both wiretapping and eavesdropping evidence at trial.

Despite the clear Federal prohibition against disclosure of wiretap information no Federal prosecutions of State officers have been undertaken, although prosecutions of State officers under State laws have occurred.

One of the most serious consequences of the present state of the law is that private parties and some law enforcement officers are invading the privacy of many citizens without control from the courts and reasonable legislative standards. While the Federal prohibition is a partial deterrent against divulgence, it has no effect on interception, and the lack of prosecutive action against violators has substantially reduced respect for the law.

The present status of the law with respect to wiretapping and bugging is intolerable. It serves the interests neither of privacy nor of law enforcement. One way or the other, the present controversy with respect to electronic surveillance must be resolved.

*The Commission recommends:*

Congress should enact legislation dealing specifically with wiretapping and bugging.

All members of the Commission agree on the difficulty of striking the balance between law enforcement benefits from the use of electronic surveillance and the threat to privacy its use may entail. Further, striking this balance presents important constitutional questions now pending before the U. S. Supreme Court in *People* v. *Berger,* and any congressional action should await the outcome of that case.

All members of the Commission believe that if authority to employ these techniques is granted it must be granted only with stringent limitations. One form of detailed regulatory statute that has been suggested to

the Commission is outlined in the appendix to the Commission's organized crime task force volume. All private use of electronic surveillance should be placed under rigid control, or it should be outlawed.

A majority of the members of the Commission believe that legislation should be enacted granting carefully circumscribed authority for electronic surveillance to law enforcement officers to the extent it may be consistent with the decision of the Supreme Court in *People* v. *Berger,* and, further, that the availability of such specific authority would significantly reduce the incentive for, and the incidence of, improper electronic surveillance.

The other members of the Commission have serious doubts about the desirability of such authority and believe that without the kind of searching inquiry that would result from further congressional consideration of electronic surveillance, particularly of the problems of bugging, there is insufficient basis to strike this balance against the interests of privacy.

Matters affecting the national security not involving criminal prosecution are outside the Commission's mandate, and nothing in this discussion is intended to affect the existing powers to protect that interest.